[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-11359

_____

Agency  No. A98-866-553

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 12, 2009
THOMAS K. KAHN
CLERK

MESSAN AMEN KUEVIAKOE,

Petitioner,

versus

UNITED STATES ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of Decision of the
Board of Immigration Appeals

_____

(May 12, 2009)

Before MARCUS, KRAVITCH and ANDERSON, Circuit Judges.

PER CURIAM:

Messan Amen Kueviakoe petitions for review of the Board of Immigration

Appeals' ("BIA") final order affirming the Immigration Judge's ("IJ") denial of his

claims for withholding of removal and relief under the United Nations Convention

Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). On appeal, he challenges the adverse credibility determination and the exclusion of untimely documents.

## I. FACTS

Kueviakoe, a native and citizen of Togo, arrived in the United States on July 31, 2004, as a non-immigrant with an F1 student visa and authorization to remain until September 13, 2005. On August 11, 2005, Kueviakoe filed an untimely asylum application, claiming that he had been persecuted and tortured in Togo because of his political opinion.[1] Approximately two weeks after his F1 visa expired, on September 26, 2005, the DHS served him with a Notice to Appear, charging that the was removable under 8 U.S.C. § 1227 (a)(1)(B), as an alien who remained in the United States for a period longer than permitted by the Attorney General. At his hearing before the IJ, on July 12, 2006, Kueviakoe withdrew his asylum application but continued to seek withholding of removal and CAT protection.

At the hearing, Kueviakoe testified that in February 2003, when he was a student at the University of Lome, he was involved in a demonstration against the

---

[1]     Asylum applications must be filed within one year of the applicant's arrival in the United States. 8 U.S.C. § 1158 (a)(2)(B).

Togolese government.[2]   The purpose of the demonstration was to protest a change

in the constitution that prohibited Kueviakoe's political party's candidate from

running for president.  At that time, Kueviakoe belonged to three groups: a political

group called the Union Force for Change, a group formed to protest the change in

the Togolese constitution called the New Dynamic Popular, and a student group

known as the CEUL.  On the day of the protest, he testified, the protesters started

their march and were at the Department of Justice when the police arrived in

trucks.  The police began to beat the protesters, who in turn began to run.  Then the

police began to shoot and fire gas in the air.  He testified that next he felt

something on his neck and fell to the ground; the police began to beat him, tied his

hands behind his back, and dragged him to their truck.  There were ten other

protesters in the truck.  After driving for about two hours, the truck stopped at a

military encampment.  The protesters were taken to large room with bars on the

windows and asked why they were insulting the president.  Then Kueviakoe was

taken out of that room, tied to a pole and lifted about two meters off of the ground.

For the next two hours, Kueviakoe testified, the police beat him with their belts and

police clubs.  After the beating, the police shoved Kueviakoe into a small cell with

---

[2]       We relate Kueviakoe's testimony, but we make only a limited ruling concerning credibility.  See infra n.4.

a lot of other people. He stayed there for two days, until protests from outside the prison made the army release him and the other detainees. However, before the police let him go, he had to sign a document vowing never to partake in another demonstration.

After his release, Kueviakoe's mother and brother picked him up and took him to a clinic. The doctors at the clinic gave him pills and an injection but told him that he needed further treatment, at a hospital that was equipped to handle his injuries. The medical record from the clinic (attached to the asylum application) showed that he was treated at the clinic for two days. Because all of the hospitals in Togo were state-run, his family took him to a hospital in Ghana. He was hospitalized for three weeks and stayed in Ghana another two weeks, waiting for the situation in Togo to calm down.

On April 30, 2004, Kueviakoe took part in another protest, this time at his university because of the government's forced retirement of some of the university's professors. Kueviakoe was at the front of the crowd because he was one of the leaders and was preparing to speak. They had just started the protest when the soldiers arrived and began to beat the protesters. Kueviakoe fled to his aunt's house, in a nearby neighborhood. After hiding there overnight, he fled to Bagita, another city in Togo and stayed with another aunt for about two weeks. At

4

that point, his mother came to the aunt's house and informed him that the police had issued a summons for his arrest. A family friend, who was a police officer, advised Kueviakoe that he should leave the country because he had breached his agreement not to protest. This friend helped Kueviakoe obtain a visa to come to the United States. However, after Kueviakoe arrived in the United States, he learned that the friend had been killed by the government police. His mother also told him that because the police had come to the family's home looking for Kueviakoe, and did not find him, they had threatened to take Kueviakoe's father in his stead. As a result, Kueviakoe's father had fled to Benin. Similarly, Kueviakoe's wife also fled to Benin a year later, as a result of post-election violence.

The IJ issued its opinion on July 12, 2006, denying his application for relief based on an adverse credibility determination. First, the IJ pointed out that Kueviakoe's written statement reported that he was dragged to the police's car after being beaten during the February 2003 protest but he testified that he was dragged to a truck. Next the court noted that in that statement, Kueviakoe wrote that when the police arrived, he ran away and sped home but during his testimony, he stated that he was hit, knocked down, and thrown into the truck. Third, the court noted a discrepancy between his testimony about his three-week hospitalization in Ghana

5

and his personal statement that the IJ read to say that he was hospitalized for two days. Finally, the IJ stated that he found it hard to believe that the police had issued a summons for Kueviakoe's arrest after the April 2004 protest when there were over 2000 participants. Without supporting documentation, the court held, Kueviakoe's testimony did not support a finding of eligibility for asylum, withholding of removal or relief under the CAT.

The BIA affirmed the IJ's decision, seeing no clear error in the adverse credibility determination. The BIA pointed to Kueviakoe's statement that he was dragged to a car in contrast to his testimony that he was thrown in a truck; his statement that he was tortured for two days in contrast to his testimony that the BIA read to say that he was not mistreated on the second day; and his statement that he was hospitalized two days after his release in contrast to his testimony that he was hospitalized for three weeks.

## I. DISCUSSION

When, as here, the BIA issues its own opinion, we review only the decision of the BIA, except to the extent the BIA expressly adopts the IJ's decision. Rodriguez Morales v. U.S. Att'y Gen., 488 F.3d 884, 890 (11th Cir. 2007). Here, the BIA issued its own opinion, upholding the IJ's adverse credibility determination and exclusion of late submitted evidence. Therefore, we review only

the BIA's decision.

Factual determinations, including credibility determinations, are reviewed under a substantial evidence standard, which provides that the decision "can be reversed only if the evidence 'compels' a reasonable fact finder to find otherwise." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1230 (11th Cir. 2005) (citations omitted); see also D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 818 (11th Cir. 2004) (noting "[c]redibility determinations are likewise reviewed under the substantial evidence test").

An alien seeking withholding of removal under the INA must show that his "life or freedom would be threatened . . . because of the alien's race, religion, nationality, membership in a particular social group, or political opinion" if he returned to the country in question. 8 U.S.C. § 1231(b)(3)(A). To do so, he must demonstrate that "he more-likely-than-not would be persecuted or tortured upon his return to the country." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). If an alien establishes past persecution in his country based on a protected ground, it is presumed that his life or freedom would be threatened upon return to his country unless the government shows by a preponderance of the evidence that (1) the country's conditions have changed so that the applicant's life or freedom would no longer be threatened upon his removal; or (2) the alien could

7

avoid a future threat to his life or freedom by relocating to another part of his country and it would be reasonable to expect him to do so. See 8 C.F.R. § 208.16(b)(1)(i); Mendoza, 327 F.3d at 1287.

If an alien's testimony is credible, it may be sufficient, without corroboration, to satisfy his burden of proof in establishing his eligibility for relief from removal. Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005); 8 C.F.R. §§ 208.13(a), 208.16(b).  A denial of asylum relief, however, can be supported solely by an adverse credibility determination, especially if the alien fails to produce corroborating evidence.  Forgue, 401 F.3d at 1287.  If the court explicitly determines that the alien lacks credibility, the court must offer specific, cogent reasons for the finding.  Id.  The burden then shifts to the alien to show that the credibility decision was not supported by "specific, cogent reasons" or was not based on substantial evidence.  Id.

In the REAL ID Act of 2005, Congress amended the law regarding credibility determinations for applications for asylum and withholding of removal filed after May 11, 2005.  See Pub.L. No. 109-13, 119 Stat. 302, § 101(h)(2).  As 8 U.S.C. § 1158(b)(1)(B)(iii) now reads:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent

8

plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal inconsistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor. There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttal presumption of credibility on appeal.

8 U.S.C. § 1158(b)(1)(B)(iii).

Here, the BIA's credibility determination was based upon three perceived inconsistencies between Kueviakoe's written statement and testimony. However, those identified inconsistencies were not sufficient to support a finding of lack of credibility because they were not inconsistencies at all; that is, no reasonable fact-finder could conclude on this record that they were inconsistencies. In other words, the record compels this conclusion. We will address each perceived inconsistency in turn.

The first inconsistency identified by the BIA was Kueviakoe's use of the word "car" in his testimony and "truck" in his written statement. We do not see an inconsistency of any importance in the word choice. Kueviakoe's words, in both cases, were translated from French, suggesting that he was not the one making the

9

word choice. More significantly, in both instances, all of the other pertinent information remained the same; for example, with respect to his comment about having been dragged to a car, he stated that ten people were with him in the vehicle. There is no plausible and material inconsistency between a "car" accommodating ten people and a "truck" accommodating ten people. Also, in his written statement, he first described the vehicles that the military and police arrived in as "trucks" and then later as "cars," demonstrating a failure to distinguish between the two words. Simply put, a reading of the record compels the conclusion that this difference in terminology is wholly immaterial.

Likewise, we reject the BIA's rationale for the second inconsistency. In his asylum statement, Kueviakoe stated that he "was arrested and tortured for two days." He described his beating at the hands of the guards on the first day; he was tied to a pole, raised two feet off of the ground and hit. After the beating, he was "thrown in a hole where there were mice and rats" and nothing to eat or drink. During his testimony, he described the same beating and then stated that he was shoved in a "small cubicle." He testified that he was not beaten on the second day. Contrary to the BIA's characterization, Kueviakoe consistently stated that he was beaten the first day and confined to a hole or small cubicle the second day. He never testified that he was not mistreated the second day; he merely testified that he

10

was not beaten the second day. The BIA simply misread the record in this regard. Therefore, the record compels the conclusion that there was no inconsistency in this regard.

Finally, with regard to perceived inconsistencies between his application statement and his testimony about his hospitalization, these are based on an error in reading on the part of the IJ and BIA. Kueviakoe stated in his application statement that his parents took him a clinic in Togo called Sainte Trinite, where he was examined and treated. He was then transported to a hospital in Ghana but he did not say how long he was hospitalized. In his application, Kueviakoe stated that he was "hospitalized two days after my release." During his testimony, he stated that after his family took him to the clinic in Togo, the doctors there advised him that he needed further care that they could not administer. He then went to the hospital in Ghana because all of the hospitals in Togo are state-run and he would not be safe there. He testified that he was hospitalized for three weeks in Ghana.

In reaching his conclusion, the IJ added the word "for" to Kueviakoe's sentence in his application so that it read "I was hospitalized for two days after my release;" the BIA did so as well. With the addition of this word, there is an inconsistency. However, the natural reading of Kueviakoe's statement, without the addition of the word, means that two days after his release, he was hospitalized.

11

This meaning is definitively confirmed by the medical record from the Saint Trinite clinic (which was attached to the same asylum application) indicating that Kueviakoe was treated at the clinic for two days. This confirms his statement that two days after his release, he was hospitalized. Thus, looking at the entirety of the application, the only reasonable reading is that he was hospitalized two days after his release. In sum, the IJ's and then the BIA's incorrect insertion of a word caused there to appear to be an inconsistency that did not in fact exist.

Because we determine that the BIA's credibility determination is not supported by any of the rationales that it cited, the record compels reversal. Hence, we GRANT [3] Kueviakoe's petition and VACATE the BIA's decision, and REMAND for further proceedings.[4]

---

[3] We reject Kueviakoe's challenge to the BIA's upholding of the IJ's refusal to admit documents submitted the day of his hearing. These documents, Kueviakoe asserts, provided the corroborating evidence of his hospital stay in Ghana. The IJ did not abuse its discretion by refusing to consider any of Kueviakoe's untimely exhibits. Kueviakoe knew of the deadline for submitting exhibits and knew the exhibits existed. Therefore, he waived the opportunity to file the documents. 8 C.F.R. § 1003.31(c). Additionally, Kueviakoe's argument on appeal centers on the exclusion of evidence of his hospitalization but the only document in the record describing his Ghana hospitalization was a letter from Dr. Apelete, which the IJ indicated he would admit but give lesser weight. Even if the IJ erred by excluding the statement, he did not abuse his discretion because it only described when the hospital admitted Kueviakoe and did not show the duration of his stay there.

[4] Although we hold that the rationale upon with the BIA relied in its credibility determination is not supported by substantial evidence, we do not foreclose a reconsideration of Kueviakoe's credibility on remand. We foreclose only an adverse credibility decision based in whole or in part upon the three alleged "inconsistencies" discussed in this opinion. Similarly, we decline to reach the merits of Kueviakoe's withholding of removal and CAT claims. See Gonzales v. Thomas, 547 U.S. 183, 126 S. Ct. 1613 (2006) (per curiam).