[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-15703
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 9, 2010
JOHN LEY
CLERK

Agency Nos. A097-918-949, A097-918-950

ROSANGELA ROJO DA SILVA,
LAERCIO APARECIDO DA SILVA,
DANIELE ROSA DA SILVA,
MARIANE ROSA DA SILVA,
LARISSA ROSA DA SILVA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(July 9, 2010)

Before BARKETT, HULL and ANDERSON, Circuit Judges.

PER CURIAM:

Rosangela Rojo Da Silva, a native and citizen of Brazil, seeks review of the Board of Immigration Appeal's ("BIA's") final order affirming the Immigration Judge's ("IJ's") denial of her application for asylum and withholding of removal.[1] Immigration & Nationality Act ("INA") §§ 208, 241; 8 U.S.C. §§ 1158, 1231. Silva claims that she was persecuted in Brazil, and would be again, on account of her political involvement in the October 2000 regional mayoral election in her hometown of Curitiba. Da Silva testified before the IJ that she received threatening phone calls before and after the election, suffered various beatings, and was abducted by supporters of the mayoral candidate from the Worker's Party— which governed Brazil at the federal level—because she campaigned for the rival PMB Party candidate. The BIA denied Da Silva's petition for asylum due to her failure to file an application within one year of her arrival in the United States or to demonstrate extraordinary circumstances excusing her delay. The BIA denied her petition for withholding, finding that her testimony regarding past persecution was not credible, the beatings and threats underlying her application did not rise to the

---

[1]    Although both the IJ and the BIA made determinations regarding Da Silva's eligibility for CAT relief, her initial asylum application did not seek such relief. As such, Da Silva did not exhaust her administrative remedies for seeking CAT relief and we lack jurisdiction to consider the issue. *See Amaya-Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1250–51 (11th Cir. 2006) (holding this Court lacks jurisdiction to consider claims not raised below by the alien even when the BIA reviews the claim *sua sponte*). Furthermore, Da Silva has not challenged the BIA's denial of her eligibility for CAT relief in this appeal, so to the extent her application may be construed as seeking CAT relief, that issue is deemed abandoned. *See Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

level of past persecution, and she had not shown that it was more likely than not that she would be harmed upon her return to Brazil.

Da Silva raises three issues on appeal. First, she argues that the BIA erred in dismissing her asylum application because her proffered explanation for her untimely filing constituted an extraordinary circumstance excusing the delay. Second, she argues that we should reverse the BIA's adverse credibility determination because her testimony at her asylum hearing was consistent with the central aspects of her asylum application, and she provided explanations for the remaining minor inconsistencies. Finally, Da Silva argues that the BIA erred in finding that the two beatings, abduction, and continuous threats of harm she endured did not amount to past persecution.

In reviewing Da Silva's petition, we look only to the BIA's decision because the BIA issued its own opinion and did not expressly adopt the opinion of the IJ. *Chen v. United States Att'y Gen.*, 463 F.3d 1228, 1230 (11th Cir. 2006) ("Where the BIA issues a decision, we review that decision, except to the extent that it expressly adopts the IJ's opinion."). Because Da Silva's application for asylum was filed in November 2003, prior to the enactment of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 (2005), the resulting statutory amendments do not apply to her case.

I.    Asylum

INA § 208(1)(2)(B) requires that an alien applying for asylum must demonstrate "by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). "An untimely asylum application may be considered if the alien can demonstrate extraordinary circumstances relating to the delay in filing an application within the one-year period." *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1287 (11th Cir. 2003) (citing 8 U.S.C. § 1158(a)(2)(D)). However, we have determined that this Court lacks jurisdiction to review a decision regarding whether an alien either complied with the one-year deadline or established extraordinary circumstances that would excuse his untimely filing. *Id.*

Da Silva filed her asylum petition in November 2003, more than one year after her arrival in the United States. She attempted to demonstrate an extraordinary circumstance causing the delay, asserting that the notary she hired to complete the application was responsible for the untimely filing. The BIA agreed with the IJ's determination that this testimony was unconvincing and dismissed Da Silva's asylum application for failure to satisfy her burden to demonstrate an extraordinary circumstance exempting her from the INA's one-year deadline. Because we lack jurisdiction to review the BIA's determination, we dismiss her petition for asylum and turn to the appeal of her application for withholding of removal. *See id.*

4

II.     Withholding of Removal

"An alien is entitled to withholding of removal under the INA if he can show that his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion."[2] *Delgado v. U.S. Att'y Gen.*, 487 F.3d 855, 860–61 (11th Cir. 2007). An alien seeking such relief "bears the burden of demonstrating that he more-likely-than-not would be persecuted or tortured upon his return to the country in question." *Id.* at 861 (internal quotation and citation omitted). To satisfy this burden, the alien must show either: "(1) past persecution in his country based on a protected ground, in which case a rebuttable presumption is created that his life or freedom would be threatened if he returned to his country, or (2) a future threat to his life or freedom on a protected ground in his country." *Id.* (internal quotation and citation omitted).

The BIA concluded that Da Silva's testimony regarding her past persecution in Brazil was not credible, and that, even had her testimony been credible, Da Silva still would have failed to satisfy her burden of proof for withholding of removal. The BIA determined that the events underlying Da Silva's application did not rise

---

[2]     Da Silva's application for asylum also sought derivative relief for her husband, Laercio Aparecido Da Silva, and her three daughters, Daniele Rosa Da Silva, Mariane Rosa Da Silva, and Larissa Rosa Da Silva, all of whom are listed as petitioners in this appeal. "Although the asylum statute explicitly creates derivative rights for the spouse of a petitioner, . . . there are no derivative benefits associated with a grant of withholding of removal." *Delgado v. U.S. Att'y Gen.*, 487 F.3d 855, 862 (11th Cir. 2007).

to the level of cognizable persecution, and that she could not establish that it would be more likely than not that she would be harmed upon her return to Brazil.

Factual determinations, including credibility determinations, are reviewed under a substantial evidence standard, which provides that a decision "can be reversed only if evidence 'compels' a reasonable fact finder to find otherwise." *Sepulveda*, 401 F.3d at 1230. Therefore, we must affirm the BIA's decision if it is supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001) (internal quotation and citation omitted). "Under the substantial evidence test, we view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc).

### A.    Credibility Determination

The BIA found that Da Silva's testimony was materially inconsistent with her asylum application and therefore not credible. If the BIA explicitly determines that an alien lacks credibility, it must offer "specific, cogent reasons" for such a finding. *Kueviakoe v. U.S. Att'y Gen.*, 567 F.3d 1301, 1305 (11th Cir. 2009). The burden then shifts to the alien to show why the credibility determination was not supported by "specific, cogent reasons" or was not based on substantial evidence. *Id.* Da Silva argues that the majority of the inconsistencies identified by the BIA

6

were minor and therefore did not constitute specific, cogent reasons for the BIA's adverse credibility determination. Further, she argues that because all such inconsistencies resulted from errors made by the notary public hired to complete her application, the BIA's decision was not based on substantial evidence. We disagree.

The inconsistencies between Da Silva's asylum application, the evidence submitted in support of her application, and her testimony before the IJ were numerous and material to her claim. First, the record contains evidence of three entirely different theories of asylum relief. Da Silva's initial asylum application sought relief on the basis of her husband's involvement in a 30-member political group called "La Pinta," which encouraged students to become involved in political activities, and claimed that she would sometimes attend the group's weekly meetings at her church. In contrast, the supporting affidavits provided by members of her community for her master calendar hearing indicated that Da Silva had been threatened "due to the fact that she had denounced irregularities of money laundering in the municipality of Curitiba." Da Silva's own affidavit, which was submitted prior to her merits hearing, and her testimony before the IJ, claimed a third theory of relief: that she and her husband were persecuted by supporters of Vainhome, the Worker's Party candidate in Curitiba's 2000 mayoral election, for campaigning for Taniguchi, the mayoral candidate that supported the daycare

7

program where she worked. It is this third theory that Da Silva embraced in her appeal before the BIA and her briefs to this Court.

Second, Da Silva's alleged past persecution varied significantly in degree and kind between her asylum application and testimony before the IJ. Da Silva's asylum application claimed that the extent of her past persecution was a series of threatening phone calls in 2001 and 2002—first aimed at her husband and then aimed at Da Silva herself following her husband's decision to flee Brazil—and a single incident in 2002 at her church in which two men approached her, looking for her husband after he left the country, spit on her face, and slapped her.

Da Silva recounted much more frequent harassment and beatings in her affidavit, and many of the details contained therein contradicted her asylum application. She claimed not only that she and her husband received threatening phone calls, but also that they were both approached at their church by "very large, strong looking men." In this account, Da Silva claimed that the men beat her husband on the back with a stick in addition to slapping her and spitting in her face. They then forced her and her husband "face down in the trunk of a car" and threatened to kill them. Da Silva claimed to have suffered a head injury, dizziness, and pain lasting for 15 days from this incident but did not provide any corroborating evidence in the form of a police or medical report. These events all allegedly occurred in 2000, surrounding Curitiba's mayoral election.

8

Da Silva also attested to an additional beating, in which two men who came to her house looking for her husband kicked and beat her. She claimed to have suffered bruises on her arms and legs and believed she had fractured her collarbone. After Taniguchi won the election, Da Silva claimed she was blamed by some for his opponent's loss, and the threatening phone calls continued, sometimes amounting to ten phone calls a day. According to her affidavit, it was then that she and her husband decided to flee Brazil.

Although Da Silva's oral testimony before the IJ largely tracked the contents of her affidavit, this testimony also diverged from previous accounts in certain respects. She claimed that she received many phone calls, but instead of ten a day, she testified to only receiving nine or ten *in total*, and on some occasions two phone calls in one week. With regard to the beating incident occurring in her home, Da Silva testified that she bled from her mouth, had bruises on her back and shoulders—as opposed to her arms and legs—, and did not mention any injury to her collarbone.

These inconsistencies were specific, cogent reasons justifying the BIA's adverse credibility determination. Contrary to Da Silva's characterization of these differences as "minor" and consisting of only one relevant inconsistency, the discrepancies are both numerous and material to her claim. The record contains three different theories of persecution and divergent accounts of the conduct

9

comprising that persecution.  Although not addressed by the IJ or BIA, the affidavits submitted by Da Silva prior to her merits hearing, which indicate she had been threatened as a result of money laundering accusations, cast further doubt on her theory of relief.

Da Silva has attempted to account for these inconsistencies by contending that portions of her initial asylum application were fabricated by the notary who prepared it.  The IJ found, and the BIA agreed, that this excuse was not credible, and instead concluded that the differences were a result of Da Silva's efforts to embellish her claim for relief.  The BIA further concluded that Da Silva did not provide sufficient corroborating evidence, such as police reports or medical records, to support her claims.

In light of the significant discrepancies between Da Silva's application and testimony, as well as the absence of any corroborating evidence of her claims, we cannot conclude that a reasonable factfinder would be compelled to reverse the BIA's adverse credibility determination on this record.  *See Yang v. U.S. Att'y Gen.*, 418 F.3d 1198, 1201 (11th Cir. 2005).  As a result, the BIA's conclusion that Da Silva's testimony was not credible is conclusive and we deny her petition for withholding of removal.  *See Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1276–77 (11th Cir. 2009) ("[A] denial of asylum relief can be supported solely by an adverse credibility determination, especially if the alien fails to produce

corroborating evidence.").[3]

DISMISSED IN PART, DENIED IN PART.

---

[3] Because substantial evidence supports the BIA's adverse credibility determination, Da Silva has failed to demonstrate her eligibility for withholding of removal. Thus, we need not consider whether, if Da Silva's testimony were credible, the actions underlying her asylum application amounted to past persecution, whether such persecution was at the hands of Vainhome supporters on account of her political opinion, or whether she would more likely than not suffer future persecution for such political opinions upon her return to Brazil.