[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-15816
Non-Argument Calendar

_____

Agency Nos. A098-944-767,
A098-944-768

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 26, 2010
JOHN LEY
CLERK

XIU YUN JIANG,
BING PING LIN,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(August 26, 2010)

Before BLACK, MARTIN and FAY, Circuit Judges.

PER CURIAM:

Xiu Yun Jiang, a Chinese citizen from the Fujian Province, petitions this

Court for review of the Board of Immigration Appeals' ("BIA") denial of her application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT").[1] That decision upheld an Immigration Judge's ("IJ") finding that Jiang failed to present a credible claim of persecution based on China's family planning policies. Jiang also seeks review of the BIA's denial of her motion to remand her case to the IJ to consider her application in light of new evidence. After thorough review, we deny her petition and affirm the BIA's denial of her motion to remand.

I.

According to Jiang, from May 2003 until August 2005, she had been "hiding" in Fuzhou, China because of dealings she describes having with Chinese family planning officials, including two forced abortions and an escape from a hospital to avoid forced sterilization. On August 29, 2005, Jiang, purportedly with the help of a paid smuggler, attempted entry into the United States at Hartsfield Jackson International Airport in Atlanta but was stopped by the Department of Homeland Security. A week later, she was deemed to be subject to removal under 8 U.S.C. § 1182(a)(7)(A)(i)(I) for failing to have proper documentation upon entry.

To avoid removal, Jiang sought permanent refuge in the United States by filing a Form I-589, Application for Asylum and for Withholding of Removal. In

---

[1] Jiang's minor daughter, Bing Ping Lin, is a derivative beneficiary of Jiang's application.

2

her application, she claimed that the persecution against her began in 1992 following her marriage to Hui Lin. She testified that although the couple was married according to rural countryside traditions, they could not obtain a formal marriage certificate because Lin was too young. When family planning officials discovered this, they took Jiang from her home, discovered she was pregnant, and forced her to have an abortion. Irate at the government's actions, Lin got into a bloody altercation with the officials and thereafter fled to the United States to avoid retaliation. After an unsuccessful attempt to obtain asylum,[2] Lin was deported back to China in early 1994 where he was allegedly detained, fined, and tortured for illegal departure.

In 1994, Jiang and Lin had a civil marriage ceremony and received a formal marriage certificate. According to her testimony, they had their first child in 1996 and remained eligible to have a second despite China's one-child policy because they lived in the countryside and their first born was a girl. In 2001, Jiang became pregnant again but suffered a miscarriage. The government, however, believed either that she had given birth and was hiding the baby or that she underwent an abortion because the child would be a girl. When the government could not uncover any evidence to support its beliefs, it inserted an intrauterine device ("IUD") in Jiang rather than force sterilization. Both Jiang's sister and brother-in-

---

[2]Lin's application was denied because of an adverse credibility determination.

3

law had been forcibly sterilized and both were able to obtain asylum in the United States.

Jiang claims that when she went for her quarterly checkup with the family planning officials in May 2003,[3] they discovered that the IUD was missing and that she was three-months pregnant. Officials then forced Jiang to undergo a second abortion and scheduled her for immediate sterilization. Given her weakened condition following the abortion, Jiang persuaded the officials to postpone the sterilization for two days. This gave her time to escape from the hospital before the procedure could be performed. Following her escape, Jiang was afraid to live with her husband and consequently spent time living with her cousins. Later that year or in early 2004, her husband returned to the United States illegally, and in August 2005, Jiang came to the United States to join him. While Jiang's application for asylum was pending before the IJ, the couple gave birth to their second child. After the IJ's denial of her application but before the BIA's decision, the couple gave birth to their third child and Jiang converted to Christianity.

---

[3]Jiang presented as evidence a booklet that kept track of her quarterly check-ups with the family planning officials from 1994 through January 2001. The booklet stated that "[o]ne couple can only have one child!" Apparently, Jiang was issued another booklet once this one was filled. That second booklet, however, is not part of the record, allegedly because when Jiang escaped the hospital to avoid forced sterilization she left it behind.

II.

Jiang has applied for asylum, withholding of removal, and CAT relief. An applicant who cannot meet the evidentiary burden to establish she is entitled to asylum generally cannot meet the heavier evidentiary burdens associated with withholding of removal or CAT relief.[4] See Najjar v. Ashcroft, 257 F.3d 1262, 1292–93, 1303 (11th Cir. 2001). We thus address Jiang's claim for asylum first.

Under 8 U.S.C. § 1158(b)(1)(A), the Secretary of Homeland Security or the Attorney General has the discretion to grant asylum to a "refugee," defined as an individual who is unwilling or unable to return to her country of residence "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Persecution on account of "political opinion" includes being subjected to forced abortions, involuntary sterilization, and other coercive population control measures. Id.

The BIA denied Jiang's application for asylum. Our review of that decision is limited to the BIA's decision itself and those portions of the IJ's decision expressly adopted by the BIA. Mohammed v. U.S. Att'y Gen., 547 F.3d 1340,

---

[4]To receive asylum, an applicant must show a "well-founded fear of persecution." 8 U.S.C. § 1158(b)(1)(A). In contrast, a grant of withholding from removal requires the applicant to show that "her life or freedom would be threatened." 8 C.F.R. § 208.16(b). Relief under the Convention Against Torture requires the applicant to establish by a preponderance of the evidence that she would be tortured in the country of removal. Id. § 208.16(c)(2).

1344 (11th Cir. 2008). In its opinion, the BIA agreed with the IJ's adverse credibility determination, which was the sole basis for upholding the denial of Jiang's application. We therefore review only the credibility determination of the IJ and do not consider Jiang's challenges to the IJ's findings regarding corroborating evidence and past and present conditions in Fujian Province, none of which were explicitly adopted by the BIA.

The denial of asylum relief may be based solely on an adverse credibility determination. Kueviakoe v. U.S. Att'y Gen., 567 F.3d 1301, 1304–05 (11th Cir. 2009). An adverse credibility determination is a finding of fact that we review under the substantial evidence test. See D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 819 (11th Cir. 2004). Under that test, the "burden is on the applicant . . . to show that the IJ's credibility decision was not supported by 'specific, cogent reasons' or was not based on substantial evidence." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005). The test is "highly deferential" and requires us to "view the record in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1026–27 (11th Cir. 2004) (en banc). We "must affirm the BIA's decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Id. at 1027 (quoting Najjar, 257 F.3d at 1283–84). We

6

will reverse only if a reasonable trier of fact, based on the record, would be compelled to reach an opposite conclusion than that reached by the IJ. Id.

Because Jiang filed her petition after May 11, 2005, the REAL ID Act requires the IJ's adverse credibility determination to be based on "the totality of the circumstances, and all relevant factors." 8 U.S.C. § 1158(b)(1)(B)(iii); Kueviakoe, 567 F.3d at 1305. The IJ may take into account the demeanor, candor, or responsiveness of the applicant; the inherent plausibility of the applicant's testimony; the consistency of her testimony with other evidence; or the internal consistency of her testimony. 8 U.S.C. § 1158(b)(1)(B)(iii). Any inconsistency, inaccuracy, or falsehood may be the basis for an adverse credibility determination, even if it does not go to the heart of the applicant's claim. Id.

After conducting an administrative hearing, the IJ issued an oral decision finding Jiang not credible based on all the evidence before him, namely thirteen exhibits, including her husband's asylum application in 1992; Jiang's testimony; and a proffer from counsel as to the testimony that Jiang's sister could provide regarding what Jiang had said about her two abortions and miscarriage.[5] In particular, the IJ based his adverse credibility determination on (1) Jiang's account of her escape from the hospital in 2003 to avoid sterilization; (2) inconsistencies

---

[5]The court and the government agreed to accept the proffer based on the understanding that Jiang's sister lacked any first-hand knowledge of either the abortions or the miscarriage.

7

regarding when she first met her husband; (3) her account of her miscarriage in 2001; (4) inconsistencies regarding her forced abortion in 1992; and (5) her inability to recall details of being smuggled into the United States.

The BIA found that the IJ's adverse credibility determination was not clearly erroneous because of "implausibilities in [Jiang's] account, particularly with respect to her purported escape from the hospital to avoid sterilization, and inconsistencies within her account as well as between her testimony and her husband's written statement" from his asylum application in 1992. The BIA did note, however, that the strength of the IJ's conclusions are "diminished by the unduly pejorative manner in which they are stated." On appeal, Jiang attacks each of the five reasons on which the IJ based his credibility determination. We consider each of them in turn, and whether, in the end, the record supports the BIA's decision.

The IJ found Jiang's account of her escape from the hospital to avoid sterilization in 2003 not only implausible but also filled with inconsistencies. Despite having an abortion the day before that left her in such a weakened condition that the family planning officials agreed to postpone the sterilization for two days, Jiang testified that she ran from the hospital for 10 minutes before catching a bus. Although some confusion appears to have existed regarding whether Jiang meant she was physically running or "running away" in the sense

8

that she was escaping from the hospital, the IJ specifically asked Jiang during her direct examination whether she ran using her own two feet:

> Q. How far did you run?
> A. Two hours bus ride.
> Q: And you ran the entire distance, ma'am?
> A. Took bus.
> Q. Ma'am, you told me you ran away from the hospital. Did you run on your own two feet away from the hospital?
> A. I ran out of the hospital and to the bus.
> Q. How far did you run from the hospital to the bus?
> A. About – around ten minutes.
> Q. You ran for ten minutes to get to the bus.
> A. Yes.

On cross-examination, however, Jiang testified that the first thing she did when she got out of the hospital was to hail a vehicle.

> Q. And then once you got outside, what'd you do?
> A. When I got out of the hospital, I, I called for a vehicle.
> Q. What do you mean called? Did you call on a phone?
> A. No. Because there are a lot of vehicles outside hospital.
> Q. So you just stopped a random vehicle outside the hospital?
> A. Yes, it happened to be a vehicle there.
> . . .

JUDGE TO MS. JIANG
> Q. By vehicle, do you mean a cab, something like a cab that you pay to take you somewhere?
> A. A motorcycle and he took me to the bus station.
> Q. Well, earlier today you told me you ran to the bus station. Which of the two is true?
> A. Yeah. Earlier I was saying I, I called vehicle, I didn't say I ran to the bus station. I, I took a motocycle to bus station and went to Fuzhou.
> Q. You never told me you ran away from the hospital to the bus station?
> A. I said I ran out hospital and I went to – got vehicle and went to the bus station.

[GOVERNMENT TO MS. JIANG]

> Q. I'm going to ask you again, ma'am. You didn't say that you ran for ten minutes to the bus station before?
>
> A. And, I, I meant it took around ten minutes to get to bus station.

Although Jiang presents a tenable argument that the IJ's perceived inconsistency was merely based on a translation problem or a misunderstanding regarding what she meant when she said she "ran" from the hospital, we cannot say that the testimony compels a conclusion contrary to that reached by the IJ. Neither does the record compel us to find her testimony plausible in light of Jiang's ability to effectuate her escape despite her admittedly weak condition and the fortuitous events surrounding her escape. The idea that both of the family planning officials guarding her happened to leave her bedside at the same time and that she was able to "run, not walk," out of the hospital without being intercepted by any other individuals caused the IJ to doubt Jiang's credibility, and the record does not compel a contrary conclusion.

Further undermining Jiang's credibility was the inconsistency regarding when she met her husband. Jiang testified that she met her husband in 1992, but then when it was revealed she got married in 1992, Jiang testified that she met him in 1991 but began living with him in 1992.

> Q. Ma'am, when did you first meet your husband?
>
> A. Early 1992.
>
> Q. You first met him in early 1992?
>
> A. Yes.
>
> Q. Okay. When was the date of your traditional wedding ceremony?

10

A.    I can't remember, it's, it's been a long time.
Q.    Well, was it in 1991 or 1992?
A.    Ninety-two.
. . .
Q.    Okay.  But you are clear that you first met your husband in 1992?
A.    In 1992, I, I started to live with my husband.
Q.    No, ma'am, I asked you when you first met your husband.
A.    Ninety-one.
Q.    And then you started to live with him in 1992.
A.    Yes.
Q.    And the traditional marriage ceremony occurred sometime in 1992?
A.    Yes.

Then, when presented with her husband's statement in his asylum application that

he knew her since childhood, she remembered that she first met him when they

were children but that they did not date, talk, or otherwise know each other.

Although Jiang presents a tenable argument that her initial answers as to when she

"met" her husband were appropriate given that they were asked in the context of

questions regarding her romantic relationship with her husband, it does not compel

the conclusion that her testimony was consistent in light of the direct questions

regarding when they "first met."

With respect to the additional grounds on which the IJ based its

decision—namely Jiang's testimony regarding her miscarriage in 2001, her forced

abortion in 1992, and her being smuggled into the United States—they are either

largely unsupported by the record or do not provide cogent reasons for finding

Jiang incredible.  At the outset, we note that the government presents no argument

11

in opposition to Jiang's argument that neither her story about her miscarriage nor her testimony regarding her smuggling trip are appropriate grounds on which to find her not credible.

The IJ found Jiang's account of her miscarriage in the first trimester "totally implausible and medically improbable." Specifically, he thought it implausible that Jiang never sought medical attention following the miscarriage and "medically improbable" that a sonogram, as Jiang testified, could confirm her pregnancy at less than two months. These findings, however, were unsupported by any evidence in the record. Rather, the IJ, based solely on his personal perception regarding the reasonableness of Jiang's actions, discounted Jiang's repeated testimony that it was common for women living in her rural village not to seek medical attention except when necessary.[6]

Unlike the IJ, we do not find Jiang's account inherently implausible. Likewise, the IJ's determination that it was "medically improbable" that the sonogram Jiang had could confirm her pregnancy at less than two months was

---

[6][JIANG'S COUNSEL TO JIANG]
Q. So Mr. – Mrs. Jiang, what's the reason why you didn't go to a doctor for check?
A. I didn't think there would be any problem, so I didn't go to see a doctor.
Q. Okay. So how, how did, how did your – how did women in your, in your village react to a miscarriage? Will they generally go to see the doctor?
A. We seldom go to see doctor. Generally speaking, no one go to see doctor.
. . .
Q. It's still hard for us to believe you didn't go to see a doctor after a miscarriage.
A. It is very common that we, we don't go to see a doctor in my area. And the girls usually don't go to see a doctor if she didn't have serious symptoms.

12

mere speculation[7] and persuasively rebutted by a litany of cases cited by Jiang on appeal noting that a sonogram can detect a fetus as early as five weeks into the pregnancy. We therefore reject the IJ's findings regarding Jiang's account of her miscarriage.[8] See Tang v. U.S. Att'y Gen., 578 F.3d 1270, 1278 (11th Cir. 2009) ("It is appropriate for us to reverse when a credibility determination is based solely on speculation and conjecture . . . .").

As for the internal inconsistencies in Jiang's account of her abortion in 1992 and the inconsistencies between her and her husband's accounts thereof, they are largely based on a misreading of the record. The IJ found Jiang incredible because she initially testified that she was taken from the clinic to the hospital and then when confronted with her husband's account, she changed her story and said she was taken from her home to the clinic and then to the hospital. The record, however, does not support this finding. Based on our review, Jiang consistently and from the outset testified that she was taken from her home by family planning

---

[7]In response to the IJ's on-the-spot question asking whether Jiang's counsel was "aware of any scientific evidence that shows a sonogram will show pregnancy about a month after pregnancy," Jiang's counsel responded that she did not "have any documents at all." Counsel's failure to adduce evidence at the moment the question was propounded does not support the IJ's conclusion of "medical improbability."

[8]Because the BIA only adopted the IJ's credibility determination, we do not weigh Jiang's failure to provide corroborating evidence of either her pregnancy or miscarriage. We simply hold that Jiang's account of her miscarriage was plausible and not medically improbable.

13

officials for a checkup and then sent for an abortion.[9] Whether she was taken from

_____

[9]On direct examination, Jiang testified as follows:

Q.     Okay. So how did the abortion happen?
A.     And there several family planning people came to my house and took me away.
Q.     Where did you have the abortion? Where did you have the abortion?
A.     At the, the same hospital.
. . .
Q.     Well, tell me how did, how did the, the government – the authorities learn that you were pregnant.
A.     Oh, they knew we have the traditional rural wedding and then we started live together and then they, they just came to take me away to, to have checkup.
. . .
Q.     Okay. How did they check? Did they take you to a hospital and do a checkup?
A.     Yes.

On cross-examination, Jiang testified as follows:

[GOVERNMENT TO MS. JIANG]
Q.     Had they asked you to have a checkup prior to taking you away?
A.     No they just came directly that day to my house.
. . .
Q.     Okay. And then when they came to your house on June 20th, they required you to have an abortion by – or on June 25th.
A.     It was like this. They ask me to go have a checkup and – around noon and, they found I was pregnant. They, they were worried I would run away.
Q.     Okay, ma'am, that's not what you told me a minute ago. You said they came and they took you forcibly to a hospital.
A.     Yes, they gave me a checkup and found I was pregnant. They wanted me to do it immediately. They were worried that if they didn't do it immediately I would run away.
JUDGE TO MS. JIANG
Q.     Let me make sure I understand, ma'am. You went to the clinic to have a checkup. And they found out that you were pregnant. And they took you from the clinic to the hospital to have the abortion, is that correct?
A.     Yes.
Q.     Why did you tell me earlier the birth control people came to your house and took your from your house to have your abortion?
A.     In our place, a clinic is called a hospital.
Q.     Ma'am, you're missing the distinction that the Court is making. Earlier, earlier you told me that the birth control people came to your house, took you from your house to have your abortion. Now you tell me that you went to the clinic to have a checkup and when the birth control officials found you were pregnant, they took you from the clinic to the hospital to have an abortion. Those are two entirely different stories and the Court just

14

her home to the clinic for that checkup and then to the hospital or directly to the hospital appears from the record to be an inconsistency in form but not substance given Jiang's plausible account that the words "hospital" and "clinic" are used interchangeably and her other testimony that family planning was a department within the hospital.[10]

There is an unexplained inconsistency, however, insofar as Jiang testified that the family planning officials only came once to her house and forced her to have an abortion that day whereas her husband stated in his asylum application that

---

wants to know why you told me two different stories. Which is the truth?
A.    In our place, clinic is hospital, hospital is clinic.
Q.    Is clinic the same thing as house and is house same thing as hospital?
A.    It is bigger than the house.
Q.    Ma'am, you're not making one bit of sense to the Court . . . .
. . .
JUDGE TO MS. JIANG
Q.    I just questioned you in detail. And you told me they took you from the clinic to have your abortion. Now you're telling me they took you from your house to have the abortion.
A.    I, I was taken from my house to the clinic. And in our place, clinic is hospital.
Q.    To have the abortion?
A.    To have checkup and then found I was pregnant and then had a forced abortion.

[10][JIANG'S COUNSEL TO MS. JIANG]
Q.    Okay. So how did the abortion happen?
A.    And there several family planning people came to my house and took me away.
Q.    Where did you have the abortion? Where did you have the abortion?
A.    At the, the same hospital.
Q.    So what happened to you after the abortion?
A.    When my husband found, I – the child was taken and my husband went to the family planning department to look for people.
Q.    He went to a family planning office? What happened there?
A.    To hospital.

15

they came twice and scheduled her for an abortion five days after their first visit. When confronted with the inconsistency, Jiang did not deviate from her story and stated: "I can only remember once. But it's been a while, I, I can't remember clearly, but what I remember is only once." The IJ found it incredible that Jiang could not recall whether, fifteen years ago, family planning officials came once or twice to her house, particularly since Jiang found the event so "traumatic as to trigger an application for asylum." Although reasonable people could disagree about whether this perceived inconsistency reflects poorly on Jiang's credibility given the passage of time and that she stuck by her story, we cannot say that it compels a different finding than that reached by the IJ. We thus find this aspect of Jiang's testimony regarding her abortion in 1992, but not the others, to be a justifiable reason on which the IJ based his credibility determination.

Last, the IJ took issue with Jiang's deliberately "vague and evasive answers" regarding the details of her being smuggled into the United States. In particular, the IJ cited that Jiang could not recall who introduced her to the smuggler and that "[s]he was unsure of the smuggler's name, did not know the name of the airline she took, the number of airplanes she took to the United States, the country she traveled through, or what document she used in order to effectuate her arrival in the United States." Some of these findings are flatly contradicted by the record. Jiang specifically testified that her cousin, Chan Xu Yin, introduced her to the

16

smuggler and that she took three planes to the United States. As for the findings that were supported by Jiang's testimony, they fail to take into account the totality of the circumstances as required by the REAL ID Act. The IJ's finding that she did not know the name of the airline fails to take into account that Jiang did not understand English.[11] Jiang's failure to know other details in our view, does not reflect negatively on Jiang's credibility given the circumstances, because this type of information would not necessarily even be known to one whom is being smuggled. For example, Jiang testified that she did not know what documents she used because she was simply following the "snakehead," and he kept the documents. Thus, we conclude that the IJ's finding on this aspect of Jiang's testimony does not constitute a cogent reason for finding her incredible.

Despite our reservations about certain bases for the IJ's adverse credibility determination, we must look at the totality of the circumstances. As a whole, we cannot say that the IJ's adverse credibility determination was insufficiently supported by "specific, cogent reasons." The account of her improbable escape from sterilization and her failure to recall details of traumatic and important events

---

[11][GOVERNMENT TO MS. JIANG]
Q.      Do you remember what airline you flew?
A.      I don't understand English.
Q.      Okay.
JUDGE TO MS. JIANG
That's why the question is being asked to you in Mandarin, ma'am.

in her life could reasonably be said to reflect poorly on her credibility. Without the benefit of observing Jiang's demeanor, candor, or responsiveness during the hearing, we must give deference to the IJ's determinations. We therefore uphold the BIA's and IJ's denial of Jiang's petition for asylum. And to the extent Jiang challenges the BIA's denial of her application for withholding of removal and for CAT relief, her challenge likewise fails. See Al Najjar, 257 F.3d at 1292–93, 1303 (stating that if an applicant is unable to meet the "well-founded fear" standard for asylum, she is generally precluded from qualifying for either withholding of removal or CAT relief).

III.

Jiang asks us to review the BIA's denial of her motion to remand her case to the IJ for further proceedings. In that motion, Jiang raised a new claim for asylum on the ground of religious persecution and stated that her having given birth to additional children following the IJ's decision may affect her family planning claim.

Because Jiang's motion to remand "seeks to introduce evidence that has not previously been presented," we construe it as motion to reopen pursuant to 8 C.F.R. § 1003.2(c). Najjar, 257 F.3d at 1301. "A motion to reopen must be supported by affidavits or other evidentiary material, and it must state new facts that will be proven at a hearing . . . if the motion is granted." Verano-Velasco v.

18

U.S. Att'y Gen., 456 F.3d 1372, 1376 (11th Cir. 2006). To that effect, Jiang submitted an affidavit describing her conversion to Christianity, which occurred about a month after the IJ's adverse ruling and about three months after she first attended a church service. She also substantiated her fear of being persecuted if she were to practice her Christian beliefs in China by including a U.S. Department of State report describing the extent of religious freedom in China and by describing the persecution suffered by her cousin Lin:

> While I was in China, my cousin Lin was involved in underground church in my hometown. She and other members of the church were frequently harassed by Chinese authority. Once, I was told her house was ramshackle by the police because she refused to surrender to the authority for the role in the church. The police beat up her husband. Later both of them disappeared and I have not heard from them since.

> I know the Chinese government forced Christian followers to worship in the so-called official churches. I deeply hated the Chinese authority and would not like to attend the system that is contaminated by the Chinese government. I believe because there is no other choice, I would have to either worship on my own or attend underground church, in case I have to return to China.

We review for abuse of discretion the BIA's denial of Jiang's motion on the ground that her claim was "too speculative" to establish a prima facie case of future persecution. Mejia Rodriguez v. Reno, 178 F.3d 1139, 1145 (11th Cir. 1999). To have made out a prima facie case, Jiang must have set forth "detailed, specific facts" that could establish either a subjective and

objective fear of being "singled out" for persecution, see Mohammed, 547 F.3d at 1345, or that China has a "pattern or practice" of persecuting a group of persons similarly situated to her, see 8 C.F.R. § 1208.13(b)(2)(iii).

Putting aside the question of the timing of Jiang's conversion, her motion fails to make out a prima facie case. Jiang's affidavit lacks details regarding the persecution faced by her cousin, including when the persecution occurred in Jiang's hometown, and whether Jiang's Christian beliefs even coincide with those for which her cousin was persecuted. Furthermore, Jiang merely speculates that she could not practice her Christianity freely in either China's registered or unregistered churches. She also fails to establish why she could not live in a region where, according to the Department of State report she submitted, government supervision of religious activity is minimal and evenhanded between registered and unregistered churches. Because we agree that Jiang's claim of future persecution is too speculative, we cannot say that the BIA abused its discretion.

Jiang also criticizes the BIA's denial of her motion for failing to consider the birth of two additional children following the IJ's ruling.[12]

---

[12]Contrary to Jiang's assertion on appeal, the IJ knew of two of her three children when he conducted the hearing on Jiang's application and issued his order.

20

However, we do not believe that Jiang sufficiently raised this issue before the BIA. In her motion, Jiang simply stated that the births of those children "may also affect" her family planning claim but failed to present any argument whatsoever as to how or to make a clear request for relief on that basis. We therefore lack jurisdiction to hear this aspect of her appeal. See Amaya-Artunduage v. U.S. Att'y. Gen., 463 F.3d 1247, 1250 (11th Cir. 2006) (citing 8 U.S.C. § 1252(d)(1) and noting that we lack jurisdiction to consider claims that have not been raised before the BIA).

For these reasons, Jiang's petition for asylum, withholding of removal, and CAT relief is DENIED, and the BIA's denial of her motion to remand is AFFIRMED.