In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 06-2835

AHMAD J. TARRAF,

*Petitioner*,

*v.*

ALBERTO R. GONZALES,
United States Attorney General,

*Respondent*.

_____

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A78-851-200.

_____

ARGUED MAY 1, 2007—DECIDED JULY 30, 2007

_____

Before RIPPLE, MANION and WILLIAMS, *Circuit Judges*.

RIPPLE, *Circuit Judge*. On February 18, 2005, an Immigration Judge ("IJ") denied Ahmad Tarraf's applications for asylum, withholding of removal and relief under the Convention Against Torture ("CAT") and ordered him removed from the United States. Mr. Tarraf appealed to the Board of Immigration Appeals ("BIA" or "Board"), which adopted and affirmed the decision of the IJ on June 1, 2006. Mr. Tarraf filed a petition for review in this court on July 5, 2006. For the reasons stated in this opinion, we deny the petition for review.

# I

# BACKGROUND

## A. Facts and Immigration Court Proceedings

Mr. Tarraf is a native and citizen of Lebanon. Since entering the United States unlawfully through Mexico in 2000, Mr. Tarraf has married a United States citizen; they have two daughters, also United States citizens.[1] After a traffic stop in October 2001, Mr. Tarraf was brought to the attention of immigration authorities, was arrested and placed in removal proceedings. Before the IJ, he conceded removability on the basis of his unlawful presence, but requested asylum, withholding of removal and CAT relief.

According to his testimony at the removal hearing, Mr. Tarraf fears persecution by Hezbollah, a group the State Department Reports describe as an "Iranian-backed Shi'a Muslim faction" that "undermine[s]" the central government of Lebanon.[2] A.R. at 173. He claims that

---

[1] Mr. Tarraf did not seek relief from removal on the basis of this marriage while he was in proceedings before the IJ and BIA. Therefore, we are concerned only with Mr. Tarraf's eligibility for relief on the basis of his claimed fear of persecution and torture if removed to Lebanon.

[2] In order to demonstrate that he was persecuted within the meaning of the law, Mr. Tarraf must show that the harm he suffered was either at the hands of the government of Lebanon (or its agents) or that the government of Lebanon was unable or unwilling to protect him from the responsible parties. *See Guchshenkov v. Ashcroft*, 366 F.3d 554, 557 (7th Cir. 2004). Mr. Tarraf testified that he requested assistance from the Lebanese authorities every time he was targeted by Hezbollah, but that

(continued...)

Hezbollah both has accused him of being an Israeli collaborator or spy and has recruited him aggressively to join its cause. Mr. Tarraf contends that, because neither he nor

---

[2] (...continued) they refused because Hezbollah was "part of the government." A.R. at 108. The Attorney General has not raised any challenge to Mr. Tarraf's asylum eligibility on the basis of a failure to meet this state action requirement. We therefore take as established, for present purposes, that if Hezbollah is responsible for persecution, it is either an agent of the state of Lebanon or a force within Lebanon that the Lebanese government is unable or unwilling to control.

We note that certain language in *Hor v. Gonzales*, 400 F.3d 482 (7th Cir. 2005) ("*Hor I*"), if read broadly, could suggest that when an alien has been targeted by an armed insurgency (rather than the government itself), he can never establish that he has been persecuted within the meaning of the law. In *Hor I*, we denied Hor's motion for a stay of removal, because we concluded that he was unlikely to succeed on the merits of his asylum claim. We noted that Hor claimed to be aligned with the government against the insurgency, and that the government had been successful in its efforts to protect Hor. *Id.* at 485-86. Hor's case was subsequently heard by a merits panel. *Hor v. Gonzales*, 421 F.3d 497 (7th Cir. 2005) ("*Hor II*"). In that subsequent decision, we vacated the Board's denial of his requests for relief. We clarified that "nongovernmental persecution is much less common than governmental persecution," but that persecution by private actors *can* give rise to viable asylum claim. *Id.* at 501 ("You cannot even claim asylum on the basis of persecution by a private group unless the government either condones it or is helpless to prevent it, *but if either of those conditions is satisfied, the claim is a good one*." (emphasis added)). To the extent that *Hor I* might be read to suggest an opposite conclusion, *Hor II* instructs that it should not be over-read.

his family has acquiesced to these demands, they have been repeated targets of threats and violence committed by Hezbollah.

Prior to his merits hearing, Mr. Tarraf submitted an asylum application with the assistance of counsel. He attached limited supporting documents, including a brief statement that provided certain details regarding his claim as well as a letter from his older brother that purported to corroborate Mr. Tarraf's history with Hezbollah.

At his removal hearing, Mr. Tarraf testified, in support of his requests for relief, about three main incidents. First, he stated that his brother, Mohsen Tarraf, was killed by Hezbollah in 1990. The record included a copy of Mohsen's death certificate written in Arabic, but the translation included in the record only states his name, village and date of death, without any information about the cause. Mr. Tarraf's testimony itself provided few other details. He said only that his brother drove a taxi and that Hezbollah tried to "send stuff with him"; he testified both that Hezbollah did not pay Mohsen and that Mohsen "declined to take stuff from them and then they killed him." A.R. at 109. According to Mr. Tarraf, because of his brother's death, he left Lebanon in fear of Hezbollah. *See id.* at 96. He began living and working primarily in Côte d'Ivoire, but returned to Lebanon for periods of one to two months almost every year thereafter until 2000.[3]

According to Mr. Tarraf, the second incident occurred on his return home to Lebanon in 1994. He testified that he

_____

[3] Some of these return trips to Lebanon followed his own health problems that arose while abroad in Africa. Other return trips related to his family obligations and still others corresponded to additional significant life events.

went to visit his ill mother in her home in Maaroub, an hour and a half outside of Beirut. He stated that he traveled to the house at night, and, while he was there, Hezbollah came looking for him. They came to the door and spoke to his father, asking whether Ahmad was home and whether they could speak with him. Mr. Tarraf's father apparently sent them away, and Mr. Tarraf waited in the home for two hours before attempting to leave. As he headed for his car, they called to him, and he tried to run away. He stated that they threw a grenade at him and that they shot him in the leg and in the back. Afterwards, he was taken to a Hezbollah clinic where he stayed for three days. When he was asked why Hezbollah had targeted him, he told the court, "they want me to work for them and I used to travel a lot and they used to—they say I'm [a] spy for Israel." *Id.* at 102. Mr. Tarraf stated that he told them that he agreed to work for them and was allowed to leave the hospital, but that he immediately headed for Beirut where he left again for Africa.

Mr. Tarraf also stated that, after this incident, he continued to travel back and forth between Côte d'Ivoire and Lebanon. Although he was not sure whether he had returned to Lebanon in 1995, he did return in 1996 to become engaged and again in 1997 around the time of his marriage. He told the court that, on this trip, "[Hezbollah] knew that [he] was there" and, therefore, he "ran away again" to Côte d'Ivoire. *Id.* at 104. Mr. Tarraf claimed that Hezbollah was "looking for [him] because they wanted [him] to work for them" and that people in his neighborhood would inform Hezbollah on each of his returns to Lebanon. *Id.* at 105. On these return trips, he stayed with his wife's family or with friends in order to avoid Hezbollah.

Mr. Tarraf stayed in Côte d'Ivoire until turmoil within that country forced his return to Lebanon in 1998 for a period of five months; thereafter, he went briefly to France, and returned again to Lebanon. In November 1998, Mr. Tarraf traveled to Syria and then to Mexico, where he attempted to enter the United States. He claims that Mexican officials would not allow his travel to the United States from Mexico City, and so again he returned to Lebanon and remained there for a year and a half.

Finally, Mr. Tarraf testified about an incident that occurred just before his actual arrival in the United States. He claimed that, in April of 2000, Hezbollah again came looking for him. He stated that he moved from house to house while in Lebanon, but that Hezbollah members found him and arrested him at a friend's house. He stated that they held him for one month until he agreed to work with them.[4] Upon prodding from the IJ about what occurred during this period of detention, he testified that Hezbollah "beat [him] up so bad everywhere." *Id.* at 111. He escaped and traveled to Mexico; from there he entered the United States. Mr. Tarraf stated that, since he had arrived in the United States, his apartment in Lebanon had been confiscated by Hezbollah and his 21 year-old nephew had been killed by them. *Id.* at 113-15. He testified that Hezbollah continued to look for him, asking even his seven year-old daughter if she knew where he was. He stated that, if he was returned, he feared that Hezbollah

---

[4] In his written statement, Mr. Tarraf had stated that he was arrested while staying with his parents and that he was held for only three days. The additional letter from his brother Abo Tarraf, included with his asylum application, also written in English, states that the detention was for a period of three days.

was "[j]ust going to torture [him] and torture [him]." *Id.* at 118.

The IJ attempted to clarify with Mr. Tarraf why he believed that Hezbollah had targeted him for the intense recruiting he had described. In response, Mr. Tarraf stated, "[t]hey wanted me to execute some operation for them, could be in Israel or anywhere outside Lebanon and they said they pay me any amount of money but I declined." *Id.* at 109. The IJ pressed Mr. Tarraf on why Hezbollah wanted *him* in particular, and he stated, "I didn't have any training of any kind or anything. . . . I used to travel a lot. It was easier for me to get visas wherever I want to go." *Id.* at 110. The IJ asked why Hezbollah would assault him as part of an attempt to recruit him, and Mr. Tarraf responded, "they just keep beating me up until I agree." *Id.* at 113.

When Mr. Tarraf had finished his substantive testimony, the IJ confronted him with inconsistencies between his live testimony and the statements in his asylum application that had been prepared with the assistance of the same attorney who represented him at the hearing. *See id.* at 119. Specifically, the IJ noted that Mr. Tarraf's written statement said that he had been captured by Hezbollah in 2000 while at his parents' house, although at his hearing he repeatedly had testified that he was at his friend's house. The IJ also noted that the written statement indicated that he had been held for three days, not one month, as Mr. Tarraf had maintained in court. Finally, the IJ questioned him regarding the varying descriptions of his detention: In his written statement, Mr. Tarraf indicated that Hezbollah had questioned and pressured him during this time, but he made no mention of any physical abuse, although at his hearing Mr. Tarraf testified several times that he was repeatedly beaten and tortured. Mr. Tarraf stated that

perhaps translation difficulties troubled the earlier statement, but that he stood behind his in-court testimony relating to his detention in 2000. *See id.* at 119. The IJ noted that his attorney speaks Arabic and seemed to question whether that explanation was plausible.

**B.  The Decision of the IJ**

The IJ denied Mr. Tarraf's requests for asylum, withholding of removal and CAT relief.

First, with respect to his asylum claim, he noted that Mr. Tarraf had filed his application more than one year after entering the country and had not demonstrated changed or exceptional circumstances to overcome the statutory bar in 8 U.S.C. § 1158(a)(2)(B).

Turning to his claim for withholding of removal, the IJ reviewed Mr. Tarraf's in-court testimony. He noted the claims of his brother's murder in 1990 and of the 1994 incident in which Mr. Tarraf was shot, but continued, "despite his refusal to support the Hezbollah, he continued to return to Lebanon every year without great difficulty," including one stretch of more than a year shortly before leaving for the United States in 2000. A.R. at 50. The IJ noted that his final departure followed, according to Mr. Tarraf, an arrest and detention of a month, during which time he was beaten and pressured to join Hezbollah; he also noted that Mr. Tarraf believed that he would be harmed or killed for his continued refusal to cooperate with Hezbollah.

After reviewing the Government's objections to relief, the IJ determined that Mr. Tarraf's applications should be denied. He concluded that Mr. Tarraf's testimony was not

credible and that he had failed to explain the discrepancies or provide corroborative evidence or detailed facts "affect[ing] his credibility and also prevent[ing] him from meeting his standard of proof." *Id.* at 52.

On the credibility issue, the IJ noted that a petitioner's testimony alone can establish the basis for asylum, but must be detailed, credible and persuasive, all of which he found lacking in this case. The IJ stated that, if Mr. Tarraf had feared persecution since 1990 when his brother was killed, his repeated trips to Lebanon undercut his claimed fear. The IJ next considered the 1994 incident in which Mr. Tarraf testified that he had been shot by Hezbollah while leaving his parents' home. The IJ noted that Mr. Tarraf had been taken by the shooters to receive medical treatment and was permitted to leave the clinic without incident. The IJ further observed that Mr. Tarraf had provided virtually no details in his description of this event. Again, the IJ noted that he returned home on numerous occasions following the incident. Under these circumstances, the IJ concluded that this incident did not support a finding that Hezbollah sought to harm Mr. Tarraf.

"More significant" to the credibility issue, according to the IJ, were the "drastic" discrepancies between the written application and the in-court testimony, specifically in regard to the final claimed incident in 2000. *Id.* at 54. Given that Mr. Tarraf had left Lebanon permanently in response to this final incident, the IJ concluded that the discrepancies "went to the heart of" Mr. Tarraf's credibility and his claim. *Id.* The IJ did not believe that it made sense that the most serious allegations of persecution were not presented or were grossly understated in Mr. Tarraf's written application submitted before trial. Therefore, the IJ concluded that

Mr. Tarraf's "in-[c]ourt contention that he was held for one month and tortured by Hezbollah [was] simply not credible in light of this inconsistency." *Id.* at 55.

The IJ went on to state that, even if Mr. Tarraf was shot in 1994 and detained in 2000 for the shorter period of three days that he had described in his written application, those incidents did not rise to the level of past persecution. The IJ ruled that, if Mr. Tarraf had been shot in 1994, the circumstances surrounding the injury as described "remain unclear." *Id.* at 56. The three-day detention and questioning without "any evidence that he was seriously injured, that he needed medical attention or hospitalization following his detention" did not support a finding of past persecution. *Id.*

Having found no past persecution, and finding that the fear of future persecution rested on the testimony regarding past events that he had ruled was "exaggerated and false," the IJ stated that Mr. Tarraf had not shown that it was more likely than not that he would be persecuted if returned. *Id.* Because he already had determined that the testimony was not credible, the IJ further stated that the absence of corroborative evidence was fatal to Mr. Tarraf's claim. The IJ denied the claim for CAT relief on the same basis.

## C. The Decision of the BIA

The Board adopted and affirmed the decision of the IJ. In its one-paragraph of analysis, the Board stated only that (1) it concurred that no exception to the one-year deadline for asylum applications applied; (2) it did not find the IJ's adverse credibility finding clearly erroneous on the record presented to it; and (3) it agreed with the IJ that the

specific inconsistency between the statement and the testimony was material, as it related to "the length of his alleged detention and the severity of his treatment, which suggests that [he] is attempting to embellish the basis for his asylum claim." *Id.* at 2. The Board "agree[d] with the [IJ] that this inconsistency goes to the heart of [Mr. Tarraf's] claim and undermines [his] credibility." *Id.* Accordingly, the Board dismissed the appeal.

Mr. Tarraf timely petitioned for review in this court, pursuing only his claims for withholding of removal and CAT relief.[5]

## II

## DISCUSSION

Because the BIA adopted and affirmed the opinion of the IJ, we review the IJ's decision as supplemented by any discussion in the BIA's opinion. *Mema v. Gonzales*, 474 F.3d 412, 416 (7th Cir. 2007). Mr. Tarraf raises three challenges to the decision of the IJ and BIA.[6] First, he claims that the IJ

---

[5] Mr. Tarraf has not asked this court to review the portion of the IJ's decision denying him asylum. *See* 8 U.S.C. § 1158(a)(3) (providing, in pertinent part, that no court shall have jurisdiction to review decisions regarding the timeliness of asylum applications and the applicability of the statutory exceptions).

[6] We note that the Government raised a jurisdictional challenge in its brief, contending that Mr. Tarraf had failed to file his petition for review in this court within the thirty-day time period provided by 8 U.S.C. § 1252(b)(1). We informed the Government at oral argument that this court was closed for a holiday at the end of the thirty-day period and, therefore, that

(continued...)

applied an incorrect standard in making his adverse credibility determination. Next, he claims that the IJ's conclusion that he did not suffer past persecution was error. Finally, he claims that the IJ erred in denying summarily his claim for CAT relief.

We review a decision denying withholding of removal and CAT relief under the deferential substantial evidence standard. *Boci v. Gonzales*, 473 F.3d 762, 767 (7th Cir. 2007); *Pavlyk v. Gonzales*, 469 F.3d 1082, 1087 (7th Cir. 2006). Under this standard, we shall grant the petition only when the record compels the conclusion that the alien was entitled to the relief sought. *Boci*, 473 F.3d at 767. An alien seeking withholding of removal bears the burden of demonstrating a clear probability that he will face persecution if removed. *Shymelskyy v. Gonzales*, 477 F.3d 474, 481 (7th Cir. 2007) (citing *INS v. Stevic*, 467 U.S. 407, 410 (1984)). "The question under [the clear probability] standard is whether it is more likely than not that the alien would be subject to persecution." *INS v. Stevic*, 467 U.S. 407, 424 (1984). The standard for establishing entitlement to CAT relief is similarly stringent. *Gomes v. Gonzales*, 473 F.3d 746, 757 (7th Cir. 2007) (noting that, to obtain CAT relief, an alien must demonstrate that it is more likely than not that he will be tortured if removed). With these general constraints on our review in mind, we now examine each of Mr. Tarraf's claims.

---

[6] (...continued)
Mr. Tarraf's filing was timely. The Government thereafter orally withdrew its jurisdictional challenge.

## A. Credibility Determination

Mr. Tarraf claims that the IJ focused on "only two discrepancies" and therefore failed to consider the totality of circumstances in making an adverse credibility determination. Appellant's Br. at 11.

Credibility determinations are factual findings that we review deferentially. *Shmyhelskyy*, 477 F.3d at 479. We shall uphold an adverse credibility determination if the record, considered as a whole, does not compel a conclusion to the contrary. *Feto v. Gonzales*, 433 F.3d 907, 912 (7th Cir. 2006) (citing *Kenyeres v. Ashcroft*, 538 U.S. 1301, 1306 (2003)); *Lin v. Ashcroft*, 385 F.3d 748, 751 (7th Cir. 2004). "We will not overturn adverse credibility determinations simply because the evidence might support an alternate finding." *Kllokoqi v. Gonzales*, 439 F.3d 336, 341 (7th Cir. 2005); *see also Giday v. Gonzales*, 434 F.3d 543, 553 (7th Cir. 2006) (noting that an adverse credibility determination cannot be reversed simply because this court would conclude that a positive credibility finding was supported by substantial evidence). Nevertheless, this court also has stated that it will not hesitate to overturn an adverse credibility determination when the IJ fails to give specific, cogent reasons that bear a legitimate nexus to the finding. *Ayi v. Gonzales*, 460 F.3d 876, 880 (7th Cir. 2006). We thus have reversed when the discrepancies were minor, *Adekpe v. Gonzales*, 480 F.3d 525, 530-31 (7th Cir. 2007), when they concerned irrelevant details in light of the alien's broader claim of persecution, *see Kllokoqi*, 439 F.3d at 341-42 (reversing the credibility determination where "the number of traumatic and tragic events that have happened to" the alien made his lack of memory on the name of a high school he attended a decade earlier insufficient to support the finding), or when the IJ failed to

consider the alien's reasonable explanations offered for a discrepancy, *see Shtaro v. Gonzales*, 435 F.3d 711, 716-17 (7th Cir. 2006) (faulting an IJ for failing to "attempt to ascertain whether [the discrepancies] could be accounted for").

We further have noted that the failure to mention, in an asylum application, certain details that later appear in live testimony does not render an alien's testimony per se incredible. *Capric v. Ashcroft*, 355 F.3d 1075, 1090 (7th Cir. 2004) (citing *Lopez-Reyes v. Ashcroft*, 79 F.3d 908, 911 (9th Cir. 1996)). We repeatedly have stated, however, that when an IJ's adverse credibility determination is based on inconsistencies between an alien's earlier statements and his testimony at his hearing that go to the heart of his claim, that are substantive and that are not easily explained or superficial, we shall uphold the adverse determination.[7]

The discrepancies in this case concern the most serious allegations of persecution, and, indeed, relate to one of only

---

[7] *Adekpe v. Gonzales*, 480 F.3d 525, 531 (7th Cir. 2007); *see also Shmyhelskyy v. Gonzales*, 477 F.3d 474, 480-81 (7th Cir. 2007) (upholding an adverse credibility determination based on the alien's unexplained failure in the written application to mention the most severe allegations of detention and physical violence that were described at trial); *Korniejew v. Ashcroft*, 371 F.3d 377, 384-85 (7th Cir. 2004) (upholding an adverse credibility determination when the alien failed to explain adequately the omission from her testimony of the most recent incident described in her written statement); *Capric v. Ashcroft*, 355 F.3d 1075, 1090 (7th Cir. 2004) ("[I]t is reasonable to expect particularly invasive events to be mentioned in asylum applications . . . .").

two events Mr. Tarraf described in which he personally was targeted. Mr. Tarraf's in-court testimony was that he was taken from his friend's home, detained, severely beaten, tortured and interrogated for a period of thirty days before he finally relented to his captors' demands that he join Hezbollah. His asylum application, by contrast, had stated that he was taken from his parents' home and detained and questioned for three days; he had made no mention of any physical violence or torture in his asylum application.

The BIA found that the changed accounts constituted an attempt by Mr. Tarraf to "embellish" his claim. A.R. at 2. The record, considered in whole, does not compel a contrary conclusion. The changed account *substantially* alters the length and severity of *the critical incident* that Mr. Tarraf says precipitated his final journey to the United States. In addition, although not mentioned by the IJ in his decision, a letter submitted along with the asylum application from Mr. Tarraf's brother states, "they found you and put you in the prison 3 dey [sic] until you agreed to work with them. At last you escaped to America . . . ." A.R. at 166-67. To the extent that the letter corroborates any part of Mr. Tarraf's claim, it supports the version of events the IJ ultimately credited and considered, a three-day detention under less severe conditions than those alleged in Mr. Tarraf's in-court testimony. The IJ's additional determination that Mr. Tarraf's description of events lacked sufficient detail further supports the IJ's credibility finding. *See Balogun v. Ashcroft*, 374 F.3d 492, 499-500 (7th Cir. 2004) (noting that, among relevant considerations in determining credibility are internal consistency and level of detail). Mr. Tarraf's description of the major events involved in his claim was perfunctory; even when pressed

for details, Mr. Tarraf said only that he was "tortured very badly" or "so beaten up," A.R. at 111.

Finally, Mr. Tarraf suggests that the IJ erred in declining to credit his explanation that perhaps language difficulties contributed to errors in the original statement. The IJ did not fail to *inquire* into the reasons for the discrepancy, *see Uwase v. Ashcroft*, 349 F.3d 1039, 1043 (7th Cir. 2003), and Mr. Tarraf gives no explanation of why the IJ should have been required to credit his explanation, especially where, as here, the IJ noted that Mr. Tarraf was represented by the same Arabic-speaking attorney both at the time of his application and his hearing. *See* A.R. at 120; *see also Feto*, 433 F.3d at 911 ("The IJ was not, however, compelled to accept [the alien's] explanation for the plain inconsistencies in his story."); *cf. Chen v. Gonzales*, 420 F.3d 707, 710 (7th Cir. 2005) (noting that, although "[s]ignificant discrepancies among different versions of an alien's statement are generally a permissible basis for an adverse credibility decision [,] . . . . initial asylum applications should not always be considered completely reliable, *particularly when filled out without the assistance of counsel*") (emphasis added). Mr. Tarraf's apparent language difficulties may have contributed, in some measure, to the discrepancies between the different versions of his story; this possibility, however, does not mean that it was impermissible for the IJ to conclude that the character of the particular discrepancies in issue should weigh against the petitioner.

The IJ's credibility analysis also mentions Mr. Tarraf's repeated trips back into Lebanon following his brother's alleged murder and the shooting incident in 1994. The IJ's opinion states that this travel "undercut [Mr. Tarraf's] credibility concerning his fear." A.R. at 39. A proposition that *any* voluntary return to one's home country renders

*any* claim regarding past and future persecution incredible would be far too broad a proposition to serve as a working rule for assessing an alien's testimony. Although we have recognized that return travel might be an appropriate factor weighing against an alien's credible fear,[8] each case must be considered in light of its own specific facts. There well may be circumstances when a person who legitimately fears persecution nevertheless might elect to return temporarily to his home country. Health conditions made worse abroad, health conditions of family members and other major life events might drive a person to choose to take certain risks and return home, while doing his best to mitigate them. Here, Mr. Tarraf contended that his trips could be justified in these terms. While we may have reached a different conclusion, we cannot say that, under the circumstances here, the IJ erred in characterizing the trips as he did.

In any event, even without this factor weighing against his credibility, we believe that the other legitimate considerations that influenced the IJ's adverse credibility determination are sufficient to sustain that ruling. We therefore uphold that determination as supported by substantial evidence.

---

[8] *See Apouviepseakoda v. Gonzales*, 475 F.3d 881, 893 (7th Cir. 2007) (holding that, when the alien previously had entered and left the United States on three occasions after claiming to have endured severe incidents of past persecution, the IJ was not "compelled to believe that . . . return trips [to the alien's home country] are what a person in dire fear of persecution . . . would do").

**B.  Past Persecution**

The IJ ruled that, even crediting Mr. Tarraf's testimony to the extent of the unembellished story of a three-day detention in 2000 and the shooting in 1994, those incidents did not support a finding of past persecution.[9] We review the conclusion that the harm the petitioner may have suffered did not rise to the level of persecution under the substantial evidence standard. *Diallo v. Ashcroft*, 381 F.3d 687, 698 (7th Cir. 2004). The IJ did not believe that Mr. Tarraf had demonstrated that his final detention resulted in serious injuries requiring medical attention or hospitalization. That the IJ declined to credit the full extent of Mr. Tarraf's claimed harms does not, in and of itself, require his subsequent conclusion that Mr. Tarraf did not suffer past persecution. Physical abuse causing serious injuries is not the sine qua non of persecution. *Dandan v. Ashcroft*, 339 F.3d 567, 573-74 (7th Cir. 2003). Persecution can include confiscation of property, surveillance and behavior that threatens future harm. *Gomes*, 473 F.3d at 754 (citing *Capric*, 355 F.3d at 1084). Conduct can rise to the level of persecution without being life-threatening, including even such acts as severe economic deprivation. *Capric*, 355 F.3d at 1084. Frequency and severity of the harms suffered by a petitioner, however, remain relevant factors in an inquiry into whether those particular harms compel a court to conclude that the alien suffered persecution. *See Dandan*, 339 F.3d at 573. We further have recognized

> that actions such as detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confisca-

---

[9]  With respect to the 1994 incident, the IJ stated only that the circumstances of this incident remain "unclear." A.R. at 41.

tion of property, surveillance, beatings, or torture might cross the line from harassment to persecution. However, recognizing that these sorts of activities *might* rise to the level of persecution is not the equivalent of saying that they always do. Persecution claims cannot simply be evaluated against a generic checklist. Review of an applicant's past experience must be carried out on the most specific level—it is the details that reveal the severity of the particular situation.

*Liu v. Ashcroft*, 380 F.3d 307, 313 (7th Cir. 2004) (internal quotation marks and citation omitted) (emphasis in original).[10]

As *Liu* acknowledges, many of the claims Mr. Tarraf makes in his testimony as a whole could support a finding of past persecution, and indeed, on another record, this court might conclude that they *compel* such a finding.[11] The extremely scant details in Mr. Tarraf's testimony, however,

---

[10] *See also Mema v. Gonzales*, 474 F.3d 412, 417-18 (7th Cir. 2007) (kidnapping at gunpoint, interrogation and beating did not compel a finding of past persecution); *Prela v. Ashcroft*, 394 F.3d 515, 518 (7th Cir. 2005) (repeated interrogations and twenty-four hour detention did not compel a finding of persecution); *Dandan v. Ashcroft*, 339 F.3d 567, 573-74 (7th Cir. 2003) (three-day detention, in which alien was deprived of food and beaten, leaving his face swollen, did not compel a finding of past persecution).

[11] We note that the IJ did not discuss specifically any of Mr. Tarraf's testimony other than the two most significant incidents of claimed persecution, in which Mr. Tarraf himself came into contact with Hezbollah. Our conclusion that the record does not compel a finding of past persecution, however, is based on the totality of evidence Mr. Tarraf produced in support of his claims. *See Bejko v. Gonzales*, 468 F.3d 482, 486-87 (7th Cir. 2006).

prevent this court from reaching that conclusion in this case. We do not hold that a petitioner must provide a blow-by-blow, minute-by-minute account of his experiences in his home country in order to establish past persecution; we note only that something more than the general allegations of detention and torture provided to the IJ in this case will compel a finding of past persecution. On the record before us, the IJ's conclusion that Mr. Tarraf did not carry his burden to establish past persecution is supported by substantial evidence.

**C. CAT Relief**

Mr. Tarraf's final claim in his petition is that the IJ denied him due process of law by summarily rejecting his request for CAT relief without applying the proper standards.

This court lacks jurisdiction to review this claim, however, because it was not presented to the BIA.[12] 8 U.S.C. § 1252(d)(1); *see also Pjetri v. Gonzales*, 468 F.3d 478, 481 (7th Cir. 2006) ("Where . . . a due process argument is based on procedural failings that the BIA is capable of addressing, the petitioner must exhaust his or her remedies at the BIA before bringing the claim in this court.").

---

[12] Mr. Tarraf claims that, although he did not couch his appeal of the denial of CAT relief in due process terms, he did fairly present this claim to the BIA. His brief to the Board does state that he appeals the denial of CAT relief. In substance, however, that brief discusses only the IJ's determinations that: (1) Mr. Tarraf is statutorily barred from asylum, (2) the harm did not rise to the level of persecution, (3) that there was no clear probability of future persecution, and (4) that Mr. Tarraf was incredible and his claim was unsupported by corroboration. *See* A.R. 11-14.

**Conclusion**

The agency's conclusions that Mr. Tarraf's in-court testimony was not credible and that, to the extent it could be credited, it did not demonstrate past persecution, are conclusions supported by substantial evidence on the administrative record as a whole. Therefore, we deny his petition for review and affirm the decision of the Board.

PETITION DENIED

DECISION AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*