In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2834

CHUN SUI YUAN,

*Petitioner*,

*v.*

LORETTA E. LYNCH, Attorney General
of the United States,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A099-525-213

ARGUED APRIL 26, 2016 — DECIDED JUNE 28, 2016

Before KANNE, SYKES, and HAMILTON, *Circuit Judges*.

KANNE, *Circuit Judge*. Chun Sui Yuan, a 36-year-old Chinese citizen, applied for asylum and withholding of removal based on his asserted opposition to China's coercive population-control policy. Central to his eligibility for relief is Yuan's testimony that employees of a government birth-control agency assaulted him because his girlfriend had

failed to attend a medical examination. An immigration judge disbelieved much of Yuan's story, reasoning that his testimony wasn't credible and also lacked corroboration. The Board of Immigration Appeals, in its own standalone decision, endorsed the adverse credibility assessment but not the Immigration Judge's ("IJ") dissatisfaction with the amount of corroborating evidence. Yuan petitions for review of the Board's decision, arguing that the credibility finding is flawed because several of the perceived inconsistencies are illusory and the actual inconsistencies are either immaterial or trivial. We agree and, thus, remand for further proceedings.

## I. Background

With the assistance of a snakehead, Yuan illegally entered the United States near Hidalgo, Texas, in November 2005. Within a few days, Yuan received a Notice to Appear charging him with removability for entering without permission. *See* 8 U.S.C. § 1182(a)(6)(A)(i). Yuan conceded removability at a November 2006 hearing before the IJ in Chicago but applied for asylum and withholding of removal. (Yuan also applied for protection under the Convention Against Torture, but that claim has been abandoned.)

In his application Yuan asserted that he feared being arrested or killed by the Chinese government because he opposes the country's coercive family planning policies. He alleged that in fall 2003 his girlfriend, Ling Lin, who was then 19 and by law too young to marry, had become pregnant. When Lin went to a mandatory exam in January 2004, said Yuan, government officials discovered the pregnancy and forced her to have an abortion. Six months later Lin skipped her required follow-up exam, prompting family planning

agents to visit Yuan's home looking for her. Yuan allegedly refused to tell the agents where to find his girlfriend because he opposed the government's family planning controls and was upset about the forced abortion. Afterward the agents continued harassing him, Yuan said, even "coming to my workplace and questioning me there." Yuan said that he yelled and cursed at the agents, who warned that he would "suffer serious consequences" if he did not bring his girlfriend to them within a month.

Then a month later, according to the narrative in Yuan's application, the family planning agents visited his parents' grocery store at 10:00 p.m., while his brother was running the store. Yuan said he was sleeping in a room above the store but went downstairs after hearing noise. Several men were present, and Yuan recognized one of them as an agent he had argued with at the birth-control office. One man yelled, "That's him," and then two others struck Yuan on the head and hands with "cleavers." The attackers fled, Yuan continued, after his brother ran from the store to get help.

According to Yuan's application, his brother summoned their parents. When they arrived and saw his condition, "they called the police, and the police took me to the hospital." Yuan said he had identified his attacker to his brother and the police, who promised to investigate but never did, even when pressed by Yuan's brother and parents. Yuan added that his parents had been threatened with jail for falsely accusing a government official. Yuan had spent two months in the hospital, he said, and then decided to flee China.

Along with his application, Yuan provided letters from his brother and parents. His brother's letter recounts the Oc-

tober 2004 incident at the family's grocery store. According to the letter, a "tall guy" pointed at Yuan and said, "That's him!" prompting the others to begin cutting Yuan with knives. After the assailants had left, the brother says, he "called the police and my parents to come and hurried my brother to Lianjiang County Hospital for emergency care." Later he learned that the "tall guy" was the officer from the birth-control office with whom Yuan had argued, but the police refused to believe this and accused the family of falsely implicating a government employee. The brother's letter states that it took eight months for Yuan to recover.

The parents' letter similarly recounts the events of October 1, 2004, "the date when our son was almost killed by the attempted murder initiated by the director of the birth control office, Wang Dong Ming." The parents explain that they had hurried to their grocery store after their other son phoned, and saw Yuan lying in a pool of blood. Then, the letter continues, "We called for help and took him to the emergency and saved his life." Afterward, the parents add, they accused Wang of "taking revenge" on Yuan but were "not only rejected, but also threatened to be put in jail." Like Yuan's brother, the parents assert in their letter that it took eight months for Yuan to recover from his injuries.

At his final removal hearing in August 2013, Yuan elaborated on the narrative in his application. He testified that he had been working as an artist in a factory when he fell in love with Ling Lin, who was studying painting at that same factory. Lin had moved in with Yuan and his family, and the couple planned to get married as soon as Lin reached the legal age. As he had said earlier in his application for asylum, Yuan testified that Lin told him that she had been forced to

undergo an abortion when her pregnancy was discovered during the mandatory exam. Because the child had been conceived illegally outside of wedlock, Yuan said, he paid a fine of 1,000 RMB, or roughly $150.

About a month later, Yuan continued, Lin had moved out of his family's home and moved in with her aunt to avoid complying with a directive to return for a follow-up exam after six months. Lin had skipped the exam, Yuan testified, and then three months later he received a notice saying that his "wife" must appear for her required examination. When Lin again did not appear, said Yuan, several officials including one from the family planning office had confronted him at his home in September 2004 and insisted that Lin must show up the following month. Yuan had replied that she no longer lived with him (though the men did not believe him), and he had yelled at them using "words of anger" and accused them of murdering his child. When the IJ asked Yuan about the allegation in his application that agents had questioned him at his workplace, Yuan answered that they had visited the factory once in September 2004 but he did not see them personally. The IJ asked why, then, Yuan's personal statement indicates that he had been "questioned" and gotten into a verbal altercation at his workplace, and Yuan responded that the argument had occurred when the officials visited his home, not the factory.

The next time Yuan was bothered by government officials, according to his testimony, was on October 1, 2004. Just as he had stated in his application, Yuan testified that several men—including Wang, whom he recognized from the family planning office—had arrived at his parent's grocery store at 10:00 p.m. and attacked him with knives and a

stick. His brother had run from the grocery to call his mother and the police, said Yuan, though it was his mother who had summoned the police. Once the police had arrived, he stated, the officers called an ambulance that took him to the hospital. His brother and mother had followed the ambulance to the hospital, he explained, but did not drive him themselves. Yuan maintained that he still has scars on his head and hands, but when he tried showing them to the IJ and government counsel, the IJ noted for the record that she "really" could not "tell what it is."

Once at the hospital, said Yuan, he had received stitches and an IV. Later on, he said, doctors had taken an X-ray of his hand and discovered a severed nerve and a "cracked" bone (though he could not remember if he was given a cast). When government counsel asked what solution was in the IV, Yuan answered that he thought "some of them" were "proteins" because he had lost "a lot of blood." The government's lawyer then demanded to know why Yuan had not mentioned in his personal statement or testimony that he had received a blood transfusion and surgery, both of which are documented in a medical report Yuan had offered into evidence. Yuan first responded, "They just give stitches," and then said, "Right here, the nerve has cut." When the government's attorney pressed him to say whether the medical report was incorrect, Yuan replied, "I do not know."

The government's attorney also questioned Yuan about his brother's whereabouts. Yuan acknowledged that his brother, too, had been smuggled into the United States and said he was living in Chicago. Asked by counsel if they lived together, Yuan said, "No." When the IJ then joined the ques-

tioning and asked Yuan where his brother was, Yuan re-
sponded, "Right now, I do not know." The IJ repeated the
question, and this time Yuan insisted that he did not know
where his brother was, that they talk by phone very seldom,
and that he hadn't spoken to his brother in about a month.
Again the IJ asked if Yuan's brother lived with him in Indi-
ana, and this time Yuan replied, "I don't know where he
working right now." After more questioning, Yuan finally
acknowledged that his brother did live with him in Indiana,
but explained:

> I will hear that you ask where he is right now per-
> sonally, so physically where he is right now. I don't
> know where he is physically right now you know.
> He working here and there you know. Like me, I
> some time working here and there.
>
> … .
>
> Yes, yes. We—he live with me but working, he
> been working here. He working out of states. He
> working other place.

Yuan maintained that he had not spoken to his brother in
"quite awhile," and said that no one had told him he should
bring his brother to the hearing to testify on his behalf or
that he should update the address in China he included for
his brother in his asylum application.

The IJ denied all relief, reasoning that Yuan had testified
inconsistently on at least four points and thus wasn't credi-
ble. The IJ explained that, first, Yuan had not disclosed in his
personal statement or testimony that he underwent surgery
and received a blood transfusion in addition to the IV and
stitches. Second, the IJ noted, Yuan had said in his personal
statement that the police took him to the hospital but then

testified that an ambulance had been called. The IJ added that the letter from Yuan's brother says, according to the IJ, that he took Yuan to the hospital. Third, concerning the alleged harassment by agents from the family planning office, the IJ asserted that Yuan's testimony that agents had questioned him at his house contradicted his written account that agents went to his place of employment and questioned him there. The IJ noted that in his testimony Yuan had said the agents spoke only with his supervisor, not him, during a workplace visit. And fourth, the IJ singled out Yuan's conflicting answers to questions about his brother's whereabouts, first denying that he knew where to find him, then admitting that they shared a residence in Indiana.

The IJ further reasoned that Yuan had not introduced adequate evidence to corroborate his claim. The IJ particularly was troubled by the absence of an affidavit from Ling Lin. The IJ also characterized Yuan's corroborating evidence as conflicting and vague: In the IJ's view, Yuan's medical evidence contradicts his personal statement and testimony; his brother's letter misled the court into believing that he still lived in China; and his parents' letter does not mention Lin, the harassment at Yuan's workplace, or the medical treatment Yuan had received at the hospital.

The Board upheld the IJ's decision, reasoning that there was "no clear error" in the IJ's adverse credibility finding. And without credible testimony, the Board concluded, the petitioner had failed to sustain his burden of proof for asylum and withholding of removal. The Board did not consider the IJ's alternative conclusion that Yuan's claim failed for lack of corroboration.

## II. Analysis

The parties seem uncertain about the scope of our review. Yuan avoids taking a position, instead stating the obvious point that sometimes we review the Board's decision and other times, the IJ's decision. The government asserts that we should "primarily" review the Board's decision and further implies that, if the IJ's decision is reviewed at all, we should limit ourselves to the portion specifically addressed by the Board (i.e., the adverse credibility finding). In fact, since the Board endorsed the IJ's reasoning but did not adopt the decision itself, we technically review only the Board's standalone opinion. *See Moab v. Gonzales*, 500 F.3d 656, 659 (7th Cir. 2007); *see also Krasilych v. Holder*, 583 F.3d 962, 966 (7th Cir. 2009).

Factual findings and credibility determinations must be supported by substantial evidence, *Lishou Wang v. Lynch*, 804 F.3d 855, 858 (7th Cir. 2015); *Tawuo v. Lynch*, 799 F.3d 725, 727 (7th Cir. 2015), while legal conclusions are reviewed de novo, *Lishou Wang*, 804 F.3d at 858; *Antia-Perea v. Holder*, 768 F.3d 647, 658–59 (7th Cir. 2014). Yuan's application was filed after enactment of the REAL ID Act of 2005, *see* Pub. L. No. 109–13, 119 Stat 231, under which an adverse credibility finding may rest on any inconsistency, whether or not it "goes to the heart of the applicant's claim." *See* 8 U.S.C. § 1158(b)(1)(B)(iii). But the Board and IJs still must distinguish between inconsistencies that are material and those that are trivial. *See Tawuo*, 799 F.3d at 727; *Krishnapillai v. Holder*, 563 F.3d 606, 616–17 (7th Cir. 2009). And reasonable explanations for discrepancies must be considered. *Tarraf v. Gonzales*, 495 F.3d 525, 532 (7th Cir. 2007).

In finding that Yuan was not credible, the Board focused on the same four points of inconsistency as the IJ: the scope of Yuan's injuries and medical treatment, Yuan's transportation to the hospital after the attack, harassment at Yuan's workplace, and the whereabouts of Yuan's brother. We address each point in turn.

*A. Scope of Yuan's injuries and medical treatment*

Yuan first challenges the Board's assertion that his testimony about his injuries and treatment after the October 2004 attack contradicts his personal statement and the medical evidence. The IJ had characterized this purported inconsistency as the "most important[]" reason for the adverse finding, but Yuan argues that his explanation for not fully recalling and describing his injuries and treatment—his head injury—was never considered. He further argues that his testimony was "not limited to his claim to have received an IV and stitches" and that he "described in detail much of the additional treatment he required," leaving no material inconsistency between his testimony and his statement and medical documentation.

We don't see the "inconsistency" between the medical report and Yuan's testimony and personal statement. We note that neither the government nor the Board ever suggested that the medical record is *fabricated*, and unless the mention of "surgery" and a "blood transfusion" in that report is *untrue*, the situation really amounts to a claimant not fully appreciating the extent of his injuries or the precise medical treatment he received. Why does this imprecision matter? It might be a different situation if Yuan was accused of *exaggerating* his injuries at the hands of the family

planning agents, but how would he benefit by minimizing those injuries?

Regardless, Yuan's testimony that physicians had to "open" up his hand "and find the veins" because a bone had been cracked and a nerve severed essentially describes a "surgery." And as for omitting the "blood transfusion," Yuan *did* explain that he received an IV (which he believed contained "proteins") *because* he had lost a lot of blood. That Yuan may not have known the content of the fluids he was receiving intravenously does not undermine his credibility. Rather, there are several potential explanations, such as his head injury (which rendered him unconscious for at least some of the time he was hospitalized), his lack of sophistication about medical procedures, and the translation of both the medical report and Yuan's testimony from Chinese to English. *See Lishou Wang*, 804 F.3d at 858 (concluding that IJ had improperly discredited petitioner's testimony based on his "innocent confusion" over name of medical procedure even though petitioner's description of procedure was consistent throughout his testimony); *Kueviakoe v. U.S. Att'y. Gen.*, 567 F.3d 1301, 1305 (11th Cir. 2009) (rejecting as neither plausible nor material Board's finding of inconsistency between petitioner's use of word "truck" in his application and "car" in his testimony and noting that petitioner's words had been translated to English on both occasions). In fact, when the subject of his treatment came up in the first hearing, Yuan stated that he "couldn't say what kind of treatment … they gave me because I'm, I'm not educated enough to understand." Yuan's description of the treatment he received is not inconsistent with how a lay person might describe a blood transfusion (receiving an IV of proteins for loss of blood) or minor surgery (cutting open

a hand and giving stitches), nor did the Board or IJ grapple with any of these potential explanations.

*B. Yuan's transportation to the hospital after the attack*

Yuan next argues that the Board mischaracterized the record in finding that his testimony was inconsistent with his documentary evidence regarding how he arrived at the hospital after his injury. Once again, it is difficult to see any significant inconsistency; there is no disagreement by the government that Yuan was transported to the hospital *by someone*. In his personal statement Yuan says that "the police" took him to the hospital, and when he testified he said that an ambulance was called for him. As Yuan argues, whether the police or an ambulance took him to the hospital is irrelevant in light of his larger claim that he was beaten and slashed by agents from the birth-control office, prompting his brother and mother to call the police for help. *See Kueviakoe*, 567 F.3d at 1305 (noting that use of inconsistent terms to describe police vehicle was immaterial, especially where "all of the other pertinent information remained the same").

Moreover, the IJ wrongly asserted that the letters from Yuan's brother and parents further contradict his accounts of how he reached the hospital. According to the IJ, Yuan's brother said that *he* took Yuan to the hospital, but, in fact, Yuan's brother wrote, "I called the police and my parents to come and hurried my brother to Lianjiang County Hospital for emergency care." Yuan's parents similarly stated, "We called for help and took him to the emergency aid and saved his life." Both of these letters have been translated from Chinese to English, so we think the IJ should have been cautious about an overly technical parsing of language. *See Kueviakoe*,

567 F.3d at 1305 (noting that no important inconsistency could be found based on word choice when petitioner's words were translated from French to English). In their letters neither Yuan's brother nor his parents state that they personally drove Yuan to the hospital. Rather, the statements suggest that the family simply made sure that Yuan was taken to the hospital—a reading that is consistent with Yuan's explanation that his family called the police, who summoned the ambulance, and then the family followed the ambulance as it transported Yuan to the hospital. Once again, the salient point is that no one disputes that Yuan's injuries required emergency hospitalization. That greater detail is provided in live testimony than was included in an asylum application is not a reason to reject a petitioner's testimony as not credible. *See Tarraf v. Gonzales*, 495 F.3d 525, 532 (7th Cir. 2007); *Kllokoqi v. Gonzales*, 439 F.3d 336, 342 (7th Cir. 2005)

C. *Yuan's statements about harassment by authorities at his workplace*

Yuan next challenges the Board's conclusion that his testimony regarding harassment by family planning agents at his workplace was inconsistent with his personal statement. The third paragraph of Yuan's personal statement, as amended during the final hearing, reads as follows:

> However, in September 2004, agents came again to my home to check why she didn't go to her examination. When they couldn't find her they came to me to find out where she went, but I refused to tell them as I was opposed to the government's coercive family controls and I was upset over what they did to my fiancée. The agents believed that I knew where she was and although they left that day, they

> continued to harass me by coming to my workplace
> and questioning me there as well. I became angry
> with them because my girlfriend's issue had noth-
> ing to do with me and then I accused them of kill-
> ing my child and now maybe they want to kill my
> fiancée, too. They cursed me and I cursed them
> back. Then they warned me that if I did not bring
> her to them in a month that I would suffer serious
> consequences.

Yuan argues that his testimony at the hearing—that he had not actually spoken to the officials when they came to his workplace and that his account of becoming angry and cursing the officials referred to their visit to his home, not his workplace—clarified, rather than contradicted, his personal statement. Given the placement of the reference to the workplace visit in the middle of a paragraph that primarily is about the officials' visit to his home, it seems plausible that the cursing and yelling describes what happened at his home, not work. Moreover, we don't perceive an inconsistency between saying, "Government officials harassed me by coming to my work and asking questions," and Yuan's explanation. We can easily imagine a worker describing as harassment the presence of government officials at his workplace *asking about* him. Even if the ambiguity is resolved as an inconsistency, the inconsistency cannot support a general finding that Yuan isn't credible. *See Hongting Liu v. Lynch*, 788 F.3d 737, 742 (7th Cir. 2015) (concluding that petitioner's technically inconsistent testimony regarding timing of her visa and passport applications did not support adverse credibility finding).

*D. Yuan's testimony about his brother's whereabouts*

Last, Yuan contends that the fourth inconsistency identified by the IJ—the whereabouts of his brother—was explained by his testimony that he believed he was being asked where his brother was at that moment rather than where his brother was living. Yuan does not argue that his testimony was consistent, and for good reason. His testimony on this point is confusing, if not blatantly inconsistent. While this may be the strongest evidence supporting a finding that Yuan was not entirely credible as a witness, the Board did not make any effort to explain why Yuan's evasiveness about his brother was sufficiently material to warrant discrediting his entire claim for relief. *See Hongting Liu*, 788 F.3d at 742; *see also Krishnapillai*, 563 F.3d at 617 (noting obligation, even after REAL ID Act, to distinguish between inconsistencies that are material and those that are not); *Kadia*, 501 F.3d at 822 (same). And, as Yuan argues, his explanation was not even considered. At least a plausible reading of the hearing transcript is that Yuan was confused about what exactly he was being asked, and his responses indicate that while his brother technically lived with him in Indiana, he often left their home for lengthy periods to seek employment elsewhere.

Finally, Yuan argues that the Board erred as a matter of law by not considering the corroborating evidence he presented. Yuan also disputes the IJ's faulting him for not providing a letter from his girlfriend. Since the Board did not address the IJ's finding regarding corroborating evidence, we will not assess that question in the first instance. Indeed, the government has specifically asked that, if we overturn

the adverse credibility finding, we remand the case to the agency to assess Yuan's eligibility on the merits.

### III. Conclusion

We conclude that the purported inconsistencies regarding Yuan's injuries and time in the hospital, his method of transportation to the hospital, and whether or not government officials questioned him at his workplace are either so easily explained or so trivial as to call into doubt the Board's decision. And even though Yuan acknowledges that his testimony regarding his brother's whereabouts was inconsistent, this lone inconsistency is not sufficiently material to warrant an adverse credibility finding under the REAL ID Act. Thus the petition for review is GRANTED.