Durkin, District Judge, concurring in part and dissenting in part
 

 I agree with the majority that Alvarenga's asylum claim is time-barred under
 
 8 U.S.C. § 1158
 
 (a)(2). But Alvarenga seeks two other forms of relief: withholding of removal and protection under the CAT. The IJ did not reach the merits of Alvarenga's withholding of removal and CAT claims because he found that Alvarenga lacked credibility. I disagree with the majority's conclusion that substantial evidence
 supports the IJ's adverse credibility finding.
 

 As the majority explains, we give substantial deference to an agency's adverse credibility determination.
 
 Song Wang
 
 ,
 
 505 F.3d at 620
 
 . Credibility determinations may be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. § 1229a(c)(4)(C). "That said, the inconsistencies spotted by the IJ should not be trivial."
 
 Tawuo
 
 ,
 
 799 F.3d at 727
 
 . An IJ "must still 'distinguish between inconsistencies ... that are material and those that are not.' "
 
 Cojocari v. Sessions
 
 ,
 
 863 F.3d 616
 
 , 620 (7th Cir. 2017) (quoting
 
 Krishnapillai v. Holder
 
 ,
 
 563 F.3d 606
 
 , 617 (7th Cir. 2009) ). This Court has " 'reversed when the discrepancies were minor, when they concerned irrelevant details in light of the [applicant]'s broader claim of persecution, or when the [IJ] failed to consider the [applicant]'s reasonable explanations offered for a discrepancy.' "
 

 Id.
 

 (quoting
 
 Tarraf v. Gonzales
 
 ,
 
 495 F.3d 525
 
 , 532 (7th Cir. 2007) );
 
 see, e.g.
 
 ,
 
 Chun Sui Yuan v. Lynch
 
 ,
 
 827 F.3d 648
 
 , 654-56 (7th Cir. 2016) (overturning adverse credibility determination where inconsistencies were trivial in the context of the applicant's "larger claim").
 

 Alvarenga's larger story has remained the same since his credible fear interview in November 2013. During that interview, in his November 2016 personal statement in support of his application, and during his April 2017 testimony before the IJ, Alvarenga described the following:
 

 On Sunday, March 10, 2013, Alvarenga and his friends were traveling by taxi to celebrate the birthday of a friend from the university Alvarenga attended in El Salvador. At one point, the taxi slowed down, and armed men approached and ordered Alvarenga and his friends to get out. When Alvarenga and his friends did not cooperate, the gunmen began shooting. At one point, Alvarenga's friend Diaz got out of the car, distracting the gunmen, and the taxi managed to get away. Alvarenga reported the shooting to the police and requested protection, but the police said they could not help.
 

 On the Wednesday following the taxi incident, Alvarenga and his parents began receiving calls from men identifying themselves as part of a gang. These men threatened to kill Alvarenga as a witness to the taxi attack unless Alvarenga paid them significant amounts of money. Two days later, on the Friday following the taxi incident, Alvarenga took the bus home from his university. At some point, several gang members, including one of the assailants from the taxi attack, got on the bus. After recognizing the assailant, Alvarenga jumped off the bus, hurting his hand. The gang members chased Alvarenga, but he escaped in a taxi. After the bus incident, Alvarenga and his parents decided he should withdraw from school, and he went into hiding. He left El Salvador several months later, and he arrived in the United States in August 2013.
 

 The IJ never acknowledged that Alvarenga's "larger claim,"
 
 Chun Sui Yuan
 
 ,
 
 827 F.3d at 654
 
 , remained consistent over the course of three and a half years. Instead, the IJ focused on two discrepancies between Alvarenga's personal statement and his testimony, both of which involved the positions of various actors during the taxi and bus incidents. The first discrepancy concerned whether Alvarenga's friend Diaz was seated in the front passenger seat or the middle of the back seat during the taxi incident. The second concerned which end of the bus the gang members boarded during the bus incident. I view these inconsistencies as trivial when considered in relation to Alvarenga's broader story.
 
 See, e.g.
 
 ,
 

 id.
 

 ("whether the police or an ambulance took [the applicant] to the hospital is
 irrelevant in light of his larger claim that he was beaten and slashed by agents from the birth-control office, prompting his brother and mother to call the police for help").
 

 The majority says the first discrepancy makes Alvarenga's story implausible because Diaz's position in the middle of the back seat as described in Alvarenga's testimony "would have required Diaz to climb over one or more passengers to exit the car." But as Alvarenga explained in both his personal statement and his testimony, one of the gang members pulled another of Alvarenga's friends out of the car and shot him.
 
 [1]
 
 Alvarenga testified that Diaz sat directly beside the friend who was pulled out of the taxi, which explains how Diaz exited without climbing over anyone. The fact that Alvarenga provided "greater detail" in his "live testimony" than he did in his personal statement "is not a reason to reject [his] testimony as not credible."
 
 See
 

 id.
 

 at 655
 
 .
 

 It is true that Alvarenga's personal statement explained that Diaz "got out of the front passenger seat," and Alvarenga testified that Diaz exited from the back. But this is not an event about which Alvarenga can be expected to have perfect recall. According to his testimony, the gunmen fired shots directly into the taxi where Alvarenga was sitting. He told the IJ: "when I heard that first shot, inside the taxi, where we were, I closed my eyes, I lowered my head and I didn't know anything of what was going on." This testimony makes it less surprising that Alvarenga got mixed up about the precise circumstances of Diaz's exit four years after the fact.
 

 The second inconsistency likewise is less suspicious when considered in the context of Alvarenga's other testimony. Alvarenga testified that the gang members boarded the bus from the front, and he explained in his personal statement and his credible fear interview that they boarded from the back. But as Alvarenga explained during his testimony, he had his "headphones in listening to music" at the time the gang members boarded the bus, and he noticed them "suddenly." He further testified that at least one gang member approached him from "behind."
 

 Viewed in fuller context, I believe the IJ placed "great significance in small variations" among Alvarenga's personal statement and his more detailed testimony.
 
 See
 

 Cojocari
 
 ,
 
 863 F.3d at 624
 
 . The IJ's focus on these small variations "call[s] the [IJ's] overall analysis into question."
 

 Id.
 

 at 626
 
 .
 

 I also find the IJ's discussion of Alvarenga's explanations problematic. The IJ said Alvarenga offered "no explanation" for the two inconsistencies. The Board likewise emphasized the lack of "explanation." But Alvarenga's testimony described above offered at least a partial explanation for both inconsistencies. He also offered an explanation when the IJ questioned him directly: Alvarenga said that he gave his personal statement over the phone and through an interpreter. His attorney argued at closing that "the inconsistencies may be explained by the exigencies of trying to work in a different language by phone, with a detained client." The IJ said he did not believe this explanation. But he did not elaborate.
 

 This Court has made clear that "reasonable explanations for discrepancies must be considered."
 
 Chun Sui Yuan
 
 ,
 
 827 F.3d at 653
 
 . Here, the IJ incorrectly stated that Alvarenga offered "no explanation" and perfunctorily dismissed counsel's argument. This was insufficient consideration.
 

 Finally, I believe the IJ improperly discounted Alvarenga's corroborating evidence.
 
 See
 

 Cojocari
 
 ,
 
 863 F.3d at 627-30
 
 (over-turning adverse credibility finding in part because IJ gave insufficient consideration to corroborating evidence). In particular, the IJ should not have so quickly rejected Alvarenga's parents' affidavits corroborating the facts of the taxi and bus incidents. The majority describes these affidavits as "dubious evidence" because they are "letters in English from his non-English-speaking parents." The IJ similarly gave "no weight" to these affidavits because they are in English. But as Alvarenga's counsel explained to the IJ, these affidavits were prepared through counsel's office. After counsel "went through the statements with [Alvarenga's parents] ... in Spanish" using an interpreter, counsel sent the affidavits to Alvarenga's parents for their signatures. In light of these representations by counsel, the fact that the letters were in English did not justify wholly discounting them.
 

 The IJ noted that Alvarenga's parents "lacked firsthand knowledge" of many of the events described. But the IJ ignored significant aspects of the affidavits about which Alvarenga's parents do have firsthand knowledge. Alvarenga's mother's affidavit describes calls to the "home phone threatening that if we didn't cooperate with the gang members they would not rest until [Alvarenga] was murdered" and demanding "first five thousand dollars, then ten thousand dollars." She says she has received "over 200 calls to [the] home phone." And she verifies that she "made [Alvarenga] stay inside [the] home" after the bus incident. She is "afraid that if [Alvarenga] returns to El Salvador, he will lose his life." Alvarenga's father similarly describes "constant threats on [his] cell phone" and calls to the home phone "asking for large amounts of money." He states: "I know [Alvarenga] will be killed if he returns to El Salvador." These aspects of the affidavits should not have gone unacknowledged.
 

 The IJ also failed to address the further corroboration Alvarenga offered for his story. This evidence included university records supporting Alvarenga's testimony that he studied engineering and played soccer from 2010 through mid-2013. Alvarenga also submitted government reports and news articles describing widespread corruption and gang activity in El Salvador. These sources explain that "extortion is a very common crime in El Salvador," and they document the inadequate governmental protection offered to gang crime witnesses. This Court recently described these unfortunate realities in El Salvador:
 

 The gangs use violence to exercise an enormous degree of social control over their territories, dictating where residents can walk, whom they can talk to, what they can wear, and when they must be inside their homes.... They extort millions of dollars from local businesses through threats of violence, and they are largely responsible for El Salvador's homicide rate-one of the highest in the world.
 

 W.G.A. v. Sessions
 
 , No. 16-4193,
 
 2018 WL 3979276
 
 , at *1 (7th Cir. Aug. 21, 2018).
 

 The IJ found it "implausible ... as a matter of how the world works" that gang members would try to extort Alvarenga and his parents three days after Alvarenga witnessed a shooting, and that gang members would then track down Alvarenga on a bus returning from his university. This may not be the way the world typically works in the United States. But Alvarenga's sources support that it is the way the world often works in El Salvador (as this Court has recently acknowledged).
 

 For these reasons, I would grant Alvarenga's petition for review and reverse the IJ's adverse credibility finding. Because the Board and IJ did not decide whether,
 if credible, Alvarenga's testimony met his burden of proof, I would remand for further consideration of the merits of Alvarenga's withholding of removal and CAT claims.
 
 See, e.g.
 
 ,
 
 Gonzales v. Thomas
 
 ,
 
 547 U.S. 183
 
 , 186,
 
 126 S.Ct. 1613
 
 ,
 
 164 L.Ed.2d 358
 
 (2006) (federal courts may not pass judgment on an issue the Board and IJ did not address).
 

 Alvarenga's credible fear interview was more summary in nature and omitted this fact; it also said nothing about Diaz's position in the taxi.